**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO. 20-31417 (JPN)** |
| **MEDCARE PEDIATRIC GROUP, LP, et al,**[1] | § | **(Chapter 11)** |
| | § | **(Jointly Administered)** |
| **Debtor.** | § | |

**DEBTORS' DISCLOSURE STATEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE FOR MEDCARE PEDIATRIC GROUP, LP, ET AL**

DATED: May 15, 2020

Matthew B. Probus
WAUSON | PROBUS
One Sugar Creek Center Blvd., Suite 880
Sugar Land, Texas 77478
(281) 242-0303 (Telephone)
(281) 242-0306 (Facsimile)

*ATTORNEY FOR DEBTORS*
*MEDCARE PEDIATRIC GROUP, LP., ET AL*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: MedCare Pediatric Group, LP (8189), Case No. 20-31417, MedCare Pediatric Nursing, LP (7791), Case No. 20-31419, MedCare Pediatric Rehab Center, LP (8770), Case No. 20-31421, MedCare Pediatric Therapy, LP (8566), Case No. 20-31423, Kinkade-Wang Enterprises, LLC (3352), Case No. 20-31424, Kinkade-Wang Properties, LLC (6081), Case No. 20-31426, Kinwan, LLC (5891), Case No. 20-31427, and KW Commercial Holdings, LLC (0960), Case No. 20-31428 (Collectively referred to as the "Debtors").

**DISCLAIMER**

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE DEBTORS' CHAPTER 11 PLAN DATED MAY 15, 2020, FILED BY MEDCARE PEDIATRIC GROUP, LP., MEDCARE PEDIATRIC NURSING, LP, MEDCARE PEDIATRIC REHAB CENTER, LP, MEDCARE PEDIATRIC THERAPY, LP, KINWAN LLC, KINKADE-WANG PROPERTIES, LLC, KINKADE-WANG ENTERPRISES, LLC, AND KW COMMERCIAL HOLDINGS, LLC, DEBTORS AND DEBTORS IN POSSESSION (AS MAY BE AMENDED IN ACCORDANCE WITH THE TERMS THEREOF AND APPLICABLE LAW, THE "PLAN"). THE INFORMATION CONTAINED HEREIN MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN SHALL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NONBANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN ANY OF THE DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CASES.

[*Remainder of Page Intentionally Left Blank.*]

## TABLE OF CONTENTS


I. INTRODUCTION ..... 5
II. OVERVIEW OF THE PLAN ..... 10
A. General Structure of the Plan ..... 10
B. Summary of Classification and Treatment of Claims and Interests under the Plan ..... 11
III. PLAN VOTING INSTRUCTIONS AND PROCEDURES ..... 22
A. Notice to Holders of Claims and Interests ..... 22
B. Voting Rights ..... 22
C. Solicitation Materials ..... 23
D. Voting Procedures, Ballots and Voting Deadline ..... 23
E. Confirmation Hearing and Deadline for Objections to Confirmation ..... 29
IV. GENERAL INFORMATION CONCERNING THE DEBTORS ..... 29
A. Overview of Business Operations ..... 29
B. Events Leading to Commencement of Chapter 11 Cases ..... 31
C. Pre-Confirmation Capital Structure of the Debtors ..... 31
D. Pre-Petition Officers, Board Members and Employees ..... 32
E. Summary of Assets ..... 33
F. Historical Financial Information ..... 33
V. THE CHAPTER 11 CASES ..... 33
VI. PLAN IMPLEMENTATION AND OTHER PROVISIONS OF THE PLAN 35
A. Plan Implementation Action Generally..... 35
B. Retention and Prosecution of Causes of Action..... 35
C. Prepetition Claim and Administrative Claim Bar Deadline..... 36
D. Provisions Governing Distribution..... 37
E. Provisions for Resolving Contested Claims..... 38
F. Miscellaneous Provisions..... 40
G. Consummation of the Plan..... 42
H. Tax Consequences of the Plan..... 42
I. Assumption and Rejection of Unexpired Leases and Executory Contracts..... 45
J. Purchases of Equity Interests of Reorganized Debtors..... 46
VII. CERTAIN RISK FACTORS TO BE CONSIDERED..... 46
A. General Considerations ..... 46
B. Certain Bankruptcy Considerations ..... 47
C. Claims Estimations ..... 47
D. Conditions Precedent to Consummation ..... 47
VIII. FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS.. 47
A. Feasibility of the Plan ..... 48
B. Liquidation Analysis ..... 49
C. Application of the “Best Interests” of Creditors Test to the Liquidation Analysis and the Valuation..... 49
D. Confirmation Without Acceptance of All Impaired Classes: The “Cramdown” Alternative..... 50

IX. CONCLUSION…………………………………………………………

**EXHIBITS**

A. Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code for MedCare Pediatric Group, LP, et al
B. Liquidation Analysis
C. Projected Financial Statements August 2020 – December 2025

**DEBTORS' DISCLOSURE STATEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE FOR MEDCARE PEDIATRIC GROUP, LP, ET AL**

The debtors and debtors-in-possession in the above-referenced chapter 11 cases (the "Chapter 11 Cases") are the following related companies (collectively referred to hereinafter as the "Debtors"):

MedCare Pediatric Group, LP ("MedCare Group")
MedCare Pediatric Nursing, LP ("MedCare Nursing")
MedCare Pediatric Rehab Center, LP ("MedCare Rehab")
MedCare Pediatric Therapy, LP (MedCare Therapy")
Kinwan, LLC ("Kinwan")
Kinkade-Wang Properties, LLC ("KW Properties")
Kinkade-Wang Enterprises, LLC ("KW Enterprises")
KW Commercial Holdings, LLC ("KW Commercial")

MedCare Group, MedCare Nursing, MedCare Rehab, and MedCare Therapy are referred to herein as the "MedCare Companies."

**I.**

# <u>INTRODUCTION</u>

The purpose of this Disclosure Statement is to enable you, as the holder of a claim against the Debtors, to make an informed decision with respect to the Plan prior to exercising your right to accept or reject the Plan.

***Your rights may be affected. You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.*** No solicitation of votes may be made except pursuant to this Disclosure Statement, and no person has been authorized to utilize any information concerning the Debtors or their businesses other than the information contained in this Disclosure Statement. You should not rely on any information relating to the Debtors and their estates, other than that contained herein.

The Debtors submit this disclosure statement (as may be amended, the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") for use in the solicitation of votes on the Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code for MedCare Pediatric Group, LP., et al dated as of May 15, 2020 (as may be amended, the "Plan"). A copy of the Plan is attached hereto as Exhibit A. Each capitalized term used in this Disclosure Statement but not otherwise defined herein has the meaning ascribed to such term in the Plan. In addition, all references in this Disclosure Statement to monetary figures refer to United States currency, unless otherwise expressly provided.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, their reasons for seeking protection and liquidation under Chapter 11 and significant events that have occurred during the Chapter 11 Cases. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims entitled to vote on the Plan must follow for their votes to be counted. These Classes are identified on pages 8 and 11 through 16 below. There are separate Classes of Claims for each of the Debtors. You should identify which Debtor you have a Claim against in order to identify the Class your Claim falls in.

By order entered on ___________, 2020, the Bankruptcy Court has approved this Disclosure Statement as containing "adequate information," in accordance with section 1125 of the Bankruptcy Code, to enable a hypothetical, reasonable investor typical of Holders of Claims against the Debtors to make an informed judgment as to whether to accept or reject the Plan, and has authorized its use in connection with the solicitation of votes with respect to the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.** No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on the Plan, Holders of Claims entitled to vote should not rely on any information relating to the Debtors and their businesses, other than that contained in this Disclosure Statement, the Plan, the Plan Supplement and all exhibits and appendices hereto and thereto. Pursuant to the provisions of the Bankruptcy Code, only classes of Claims or Interests that are (a) "impaired" by a plan and (b) entitled to receive a distribution under such plan are entitled to vote on such plan. In the Debtors' cases, only Claims in certain Classes are Impaired by and entitled to receive a distribution under the Plan; accordingly, only the Holders of Claims in those Classes are entitled to vote to accept or reject the Plan. Claims in certain Classes are Unimpaired by the Plan; accordingly, the Holders thereof are conclusively presumed to have accepted the Plan. Holders Claims or Interests in some Classes receive nothing under the Plan and are deemed to have rejected the Plan and are not entitled to vote.

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISKS AND OTHER FACTORS PERTAINING TO THE PLAN, PLEASE SEE ARTICLE VI OF THIS DISCLOSURE STATEMENT, ENTITLED "SUMMARY OF THE PLAN" AND ARTICLE VII OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED."

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PLAN, CERTAIN EVENTS THAT HAVE OCCURRED IN THE CHAPTER 11 CASES AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE SUMMARIES OF THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS AND

TO THE EXTENT THEY MAY CHANGE AS PERMITTED BY THE PLAN AND APPLICABLE LAW. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

NOTHING CONTAINED HEREIN SHALL BE DEEMED TO CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS OR INTERESTS. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY STATED HEREIN, THIS DISCLOSURE STATEMENT DOES NOT REFLECT ANY EVENTS THAT MAY OCCUR SUBSEQUENT TO THE DATE HEREOF AND THAT MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS DO NOT ANTICIPATE THAT ANY AMENDMENTS OR SUPPLEMENTS TO THIS DISCLOSURE STATEMENT WILL BE DISTRIBUTED TO REFLECT SUCH OCCURRENCES. ACCORDINGLY, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCE IMPLY THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

THE DEBTORS BELIEVE THAT THE PLAN WILL ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR CREDITORS AND THEIR ESTATES. THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT THE PLAN.

## ANSWERS TO CERTAIN QUESTIONS ABOUT THE PLAN AND DISCLOSURE STATEMENT

*The information presented in the answers to the questions set forth below is qualified in its entirety by reference to the full text of this Disclosure Statement, including the Plan.* All creditors entitled to vote on the Plan are encouraged to read and carefully consider this entire Disclosure Statement, including the Plan, prior to submitting a Ballot to accept or reject the Plan.

***What is this document and why am I receiving it?***

On March 1, 2020, each Debtor filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code. The Debtors continue in possession of their properties and are managing their businesses as debtors-in-possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. In connection with the proposed sale of the Liquidating Debtors' assets and the continued operation of the Restructuring Debtors in accordance with chapter 11, the Debtors have prepared the Plan, as a joint plan, which sets forth in detail the proposed treatment of the Claims of the Debtors' creditors and Interests of the Debtors' equity interest holders. This Disclosure Statement describes the terms of, and certain other material information relating to, the Plan.

This Disclosure Statement is being delivered to you because you either are or may be the holder of, or have otherwise asserted, either a Claim or Claims against the Debtors. This Disclosure Statement is intended to provide you with information sufficient to make an informed decision as to whether to vote to accept or reject the Plan.

***Am I eligible to vote to accept or reject the Plan?***

You are entitled to vote to accept or reject the Plan only if you hold an Allowed Claim (or a Claim that has been temporarily allowed for voting purposes) that is impaired in one or more of the following Classes:

| | | |
|---|---|---|
| MedCare Group | - | Classes 1 and 2 |
| MedCare Nursing | - | Classes 1 and 2 |
| MedCare Rehab | - | Classes 1 and 2 |
| MedCare Therapy | - | Classes 1 and 2 |
| Kinwan, | - | Classes 1 and 2 |
| KW Properties | - | Classes 1 and 2 |
| KW Enterprises | - | Classes 1 and 2 |
| KW Commercial | - | Classes 1 and 2 |

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not eligible to vote with respect to the Plan as a holder of such Claim and are therefore not classified above. The Holders of such claims are Debtors' counsel Wauson | Probus, Debtors' accountants CMCD LLC, and the U.S. Treasury Internal Revenue Service.

***Why should I vote to accept the Plan?***

Simply put, from a creditor's perspective, the Debtors believe that the Plan provides the best means for achieving the maximum distribution on account of your prepetition claim. The Plan is the product of months of difficult negotiations, and is believed to have the support of the major constituencies who have had the financial resources to investigate and pursue alternative courses for achieving a distribution on account of the prepetition claims. It is believed that a failure to achieve confirmation of the Plan will result in a piecemeal liquidation of the Assets, with little or no prospects for distributions to unsecured creditors.

***How do I vote to accept or reject the Plan?***

If you are entitled to vote on the Plan because you are the holder of a Claim that is Allowed or has been temporarily allowed for voting purposes, as the case may be, you must complete, sign and return your Ballot or Ballots in accordance with the ballot instructions to be provided.

***What if I'm entitled to vote to accept or reject the Plan and don't?***

In general, within any particular class of Claims, only those holders of Claims who actually vote to accept or to reject the Plan will affect whether the Plan is accepted by the requisite holders of Claims in such Class. The holders representing at least two-thirds in dollar amount and a majority in number of the Claims in such Class that are allowed or have been temporarily allowed for voting purposes, as the case may be, and that are held by holders of such Claims who actually vote to accept or to reject the Plan must vote to accept the Plan.

***What happens if the Plan is not accepted by each Class entitled to vote on the Plan?***

If the holders of each Class of Claims entitled to vote on the Plan vote to reject the Plan, the Plan may or may not be confirmed or consummated in its present form. However, as long as the requisite holders of Claims in one of the above enumerated classes vote to accept the Plan, the Debtors may seek Confirmation pursuant to the "cramdown" provisions of the Bankruptcy Code (which will require a determination by the Bankruptcy Court that that the Plan is "fair and equitable" and "does not discriminate unfairly" as to each impaired Class that does not accept the Plan or is deemed to have rejected it). The Debtors believe that the Plan satisfies the "cramdown" provisions of the Bankruptcy Code and, in any case, have reserved the right to modify the Plan to the extent that Confirmation thereunder requires modification.

***What will I receive if my Claim is Disputed?***

No distributions will be made on account of any Claim that is a Disputed Claim unless and until that Claim becomes an Allowed Claim in accordance with the procedures for resolving Disputed Claims set forth in the Plan.

***When will the Plan be confirmed?***

After the Bankruptcy Court has approved the form and adequacy of information in this Disclosure Statement, the Bankruptcy Court will schedule and conduct a hearing concerning Confirmation of the Plan. The Plan confirmation hearing is scheduled for ________________, 2020, at __________ __.m.. The Plan confirmation hearing may be continued or adjourned, however, and even if it is held, there is no guaranty that the Bankruptcy Court will find that the requirements of the Bankruptcy Code with respect to Confirmation have been met. In addition, the conditions to Confirmation set forth in the Plan must be satisfied or waived in accordance with the Plan before the Plan can be confirmed. Thus, while the Debtors expect the Plan to be confirmed perhaps as early as ________________, 2020, there is no way to predict with any certainty when, if ever, Confirmation will actually occur.

***When will the Plan be effective?***

Even if the Plan is confirmed in July of 2018, there are a number of additional conditions that must be satisfied or waived before the Plan can become effective. The Effective Date will not occur until after the Plan has been confirmed. No assurance can be given as to if or when the Effective Date will actually occur.

***What happens if the Plan isn't confirmed or doesn't become effective?***

The Debtors expect that all of the conditions to Confirmation and effectiveness of the Plan will be satisfied (or waived in accordance with the Plan). There is no guaranty, however, that the Plan will become effective. Although the Debtors intend to take all acts reasonably necessary to satisfy the conditions to the Confirmation and effectiveness of the Plan that are within the Debtors' control, if, for any reason, the Plan is not confirmed or does not become effective, the Debtors may be forced to propose an alternative plan or plans of reorganization under Chapter 11 of the Bankruptcy Code. If no plan of reorganization or liquidation can be confirmed, the Debtors may have to convert to a liquidation case under chapter 7 of the Bankruptcy Code.

## II.

## OVERVIEW OF THE PLAN

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms and provisions of the Plan, see Article VI of this Disclosure Statement, entitled "Summary of the Plan."

The Plan provides for the classification and treatment of Claims against and Interests in the Debtors. These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests.

### A. General Structure of the Plan

The Plan is structured as one plan, but each of the entities is provided for separately and is separately treating its classes of creditors under the Plan. The Debtors will pursue all reasonably available actions to maximize distributions under the Plan to Holders of Claims and Interests.

Under the Plan, KW Enterprises will be liquidated. Its only asset will be sold pursuant to 11 U.S.C. § 363(b) or returned to the holder of the first lien deed of trust, Veritex Community Bank ("Veritex"). There are no Holders of Unsecured Claims and the only other creditor of each is the county taxing authority with 2020 ad valorem tax Claims, which are in rem and will either be paid upon the sale or go with the property to Veritex upon return of the property.

Under the Plan, the MedCare Companies will remain in business and restructure their debts. These Debtors anticipate that the unsecured creditors will receive 100% of the Allowed Amount of their Claims. The owners of the equity interests (with the exception of the general

partners of each of the MedCare Companies) will relinquish their interests. Steve Wang and Paige Kinkade will purchase the limited partnership interests of the reorganized MedCare Companies. The purchase price shall be the amount required to pay allowed administrative claims of professionals, which could well be in excess of $250,000.00. In addition, they will cause all of their loans to the MedCare Companies to be converted into equity, saving hundreds of thousands of dollars in debt to the estates. Steve Wang and Paige Kinkade will retain their membership interests in Kinwan and KW Commercial.

The Debtors have estimated the ultimate distributions that will be made in respect of Allowed Claims and Interests. As explained more fully in Section VII entitled "Certain Risk Factors to Be Considered," because of inherent uncertainties, many of which are beyond the Debtors' control, there can be no guaranty that actual performance will meet the Debtors' estimates. The Debtors nonetheless believe that if the Plan is not consummated, it is likely that Holders of Claims against and Interests in the Debtors' estates will receive less than they would if the Plan is confirmed because liquidation of the Debtors' assets under Chapter 7 of the Bankruptcy Code will not result in a higher distribution to any Class of Claims or Interests.

## B. Summary of Classification and Treatment of Claims and Interests under the Plan

The table below summarizes the classification and treatment of the prepetition Claims against and Interests in the Debtors under the Plan. For certain Classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown in the table that follows. Except for Claims Allowed by the Plan, estimated Claim amounts for each Class set forth below are based upon the Debtors' review of their books and records, and include estimates of a number of Claims that are contingent, disputed and/or unliquidated. Accordingly, for these reasons, no representation can be or is being made with respect to whether the estimated percentage recoveries shown below will actually be realized by the Holders of Allowed Claims in such Classes.

### 1. General Summary of Classes of Claims Under the Plan:

| Type of Claim or Interest | Description and Treatment under Plan |
|---|---|
| **Unclassified – Administrative Claims** | An Administrative Claim is a Claim for (a) any cost or expense of administration (including, without limitation, the fees and expenses of Professionals) of any of the Chapter 11 Cases asserted or arising under sections 503, 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code.<br>Under the Plan, Administrative Claims are Unimpaired. Unless otherwise provided for therein, and subject to the bar date provisions set forth in the Plan and additional requirements for Professionals and certain other entities set forth below, each Holder of an Allowed Administrative Claim shall receive in full satisfaction, settlement, release, and extinguishment of such Claim the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the |

| | |
|---|---|
| | date on which such Administrative Claim becomes Allowed, (iii) a date agreed to in writing by the Debtors and the Holder of such Administrative Claim, and (iv) the date on which the Administrative Claim becomes due in accordance with its terms if not Disputed.<br><br>All U.S. Trustee's Fee Claims, as determined, if necessary, by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid on or before the Effective Date by the Debtors. On and after the Effective Date, the Debtors shall pay any and all such fees, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee.<br><br>Administrative Claims are not classified and are treated as required by the Bankruptcy Code. The Holders of such Claims are not entitled to vote on the Plan. |

| | |
|---|---|
| **Unclassified — Priority Tax Claims** | The Plan defines Priority Tax Claims as any and all Claims accorded priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.<br><br>Under the Plan, Priority Tax Claims are Unimpaired. Priority Tax Claims are not classified and are treated as required by the Bankruptcy Code. The Holders of such Claims are not entitled to vote on the Plan. This Class consists of the U.S. Treasury Department, Internal Revenue Service. |

| | |
|---|---|
| **Veritex Community Bank's Secured Claims** | These are promissory notes made by Kinwan, KW Properties, KW Enterprises, and KW Commercial, secured by first lien deeds of trust, all cross collateralized along with assets of the MedCare Companies. The Debtor believes that the value of the real property and improvements serving as collateral well exceeds the amount of the debt. |
| **Tax Authorities' Secured Claims** | These are business personal property taxes estimated for the 2020 tax year and secured by statute in the Texas Tax Code. The Debtor believes that the personal property securing these taxes exceeds the amount of the debt. |

| | |
|---|---|
| **General Unsecured Claims** | These Claims are the Allowed Unsecured Claims of the MedCare Companies. There are no unsecured claims against Kinwan, KW Properties, KW Enterprises, and KW Commercial.<br><br>Under the Plan, the Allowed Claims will be paid in full over a period of 72 months in equal monthly installments with 2% interest. |
| **Equity Security Holders** | This Class consists of the equity interests of the MedCare Companies and the equity interests of Kinwan, KW Properties, KW Enterprises, and KW Commercial.<br><br>The Holders of interests in the MedCare Companies, KW Properties, and KW Enterprises, will receive nothing on account of their interests. Steve Wang and Paige Kinkade will purchase the limited partnership interests of the MedCare Companies. The purchase price shall be the amount required to pay allowed administrative claims of professionals, which could well be in excess of $250,000.00. In addition, they will cause all of their loans to the MedCare Companies to be converted into equity, saving hundreds of thousands of dollars in debt to the estates. Steve Wang and Paige Kinkade will retain their membership interests in Kinwan and KW Commercial. |

**2. <u>Classification of Debtors' Claims and Interests:</u>**

**<u>MedCare Group's Claims and Interests</u>**

<u>MedCare Group Class 1 Claim</u>. This class consists of the Allowed, Secured Tax Claims of Fort Bend County and Fort Bend County WICD #2.

<u>MedCare Group Class 2 Claims</u>. This class consists of the Allowed, General Unsecured Claims.

<u>MedCare Group Class 3 Interests</u>. This class consists of all Allowed, Equity Interests in MedCare Group. This class consists of Steve Wang, Paige Kinkade, and MedCare Pediatric Group GP, LLC.

**<u>MedCare Nursing's Claims and Interests</u>**

<u>MedCare Nursing Class 1 Claim</u>. This class consists of the Allowed, Secured Tax Claims of Fort Bend County and Fort Bend County WICD #2.

MedCare Nursing Class 2 Claims. This class consists of the Allowed, General Unsecured Claims.

MedCare Nursing Class 3 Interests. This class consists of all Allowed, Equity Interests in MedCare Nursing. This class consists of MedCare Group, MedCare NSG, LLC, Steve Wang, and Paige Kinkade.

**MedCare Rehab's Claims and Interests**

MedCare Rehab Class 1 Claim. This class consists of the Allowed, Secured Tax Claims of Fort Bend County and Fort Bend County WICD #2.

MedCare Rehab Class 2 Claims. This class consists of the Allowed, General Unsecured Claims.

MedCare Nursing Class 3 Interests. This class consists of all Allowed, Equity Interests in MedCare Rehab. This class consists of MedCare Group, MedCare Pediatric Rehab GP, LLC, Steve Wang, and Paige Kinkade.

**MedCare Therapy's Claims and Interests**

MedCare Therapy Class 1 Claim. This class consists of the Allowed, Secured Tax Claims of Fort Bend County and Fort Bend County WICD #2.

MedCare Therapy Class 2 Claims. This class consists of the Allowed, General Unsecured Claims.

MedCare Therapy Class 3 Interests. This class consists of all Allowed, Equity Interests in MedCare Therapy. This class consists of MedCare Group, MedCare TPY, LLC, Steve Wang, and Paige Kinkade.

**Kinwan's Claims and Interests**

Kinwan Class 1 Claim. This class consists of the Allowed, Secured Claim of Veritex based on the promissory note dated 2/7/2018, secured by deed of trust and security agreement and assignment of rents, interest at 4.75%, payable by monthly P&I payment of $26,043.63, with a 15-year term, approximate principal balance of $4,363,799.66 (the "Kinwan Note").

Kinwan Class 2 Claim. This class consists of the Allowed, Secured Tax Claims of Fort Bend County and Fort Bend County WICD #2.

Kinwan Class 3 Interests. This class consists of all Allowed, Equity Interests in Kinwan. This class consists Steve Wang and Paige Kinkade.

**KW Properties' Claims and Interests**

KW Properties Class 1 Claim. This class consists of the Allowed, Secured Claim of Veritex based on: (a) the promissory note dated 9/21/2016, secured by deed of trust and security agreement and assignment of rents, interest at 4.5%, payable by monthly P&I payment of $9,160.01, with a 20-year term, approximate principal balance of $1,275,906.33; and (b) the promissory note dated 9/21/20216, secured by deed of trust and security agreement and assignment of rents, interest at 4.5%, payable by monthly P&I payment of $7,379.13, with a 20-year term, approximate principal balance of $1,028,605.76 (the "KW Properties Notes").

KW Properties Class 2 Claim. This class consists of the Allowed, Secured Tax Claims of Fort Bend County and Fort Bend County WICD #2.

KW Properties Class 3 Interests. This class consists of all Allowed, Equity Interests in KW Properties. This class consists Steve Wang and Paige Kinkade.

**KW Enterprises Claims and Interests**

KW Enterprises Class 1 Claim. This class consists of the Allowed, Secured Claim of Veritex, based on the promissory note dated 9/21/2016, secured by deed of trust and security agreement and assignment of rents, interest at 4.5%, payable by monthly P&I payment of $8,956.74, with a 20-year term, approximate principal balance of $1,246,993.73. (the "KW Enterprises Note").

KW Enterprises Class 2 Claim. This class consists of the Allowed, Secured Tax Claims of Fort Bend County and Fort Bend County WICD #2.

KW Enterprises Class 3 Interests. This class consists of all Allowed, Equity Interests in KW Enterprises. This class consists Steve Wang and Paige Kinkade.

**KW Commercial's Claims and Interests**

KW Commercial Class 1 Claim. This class consists of the Allowed, Secured Claim of Veritex, based on the promissory note dated 1/8/2016, secured by deed of trust and security agreement, interest at prime plus 1%, payable by monthly P&I payment of $4,532.30, with a 20-year term, approximate principal balance of $631,983.37. (the "KW Commercial Note").

KW Commercial Class 2 Claim. This class consists of the Allowed, Secured Tax Claims of Fort Bend County and Fort Bend County WICD #2.

KW Commercial Class 3 Interests. This class consists of all Allowed, Equity Interests in KW Commercial. This class consists Steve Wang and Paige Kinkade.

### 3. Treatment of Debtors' Claims and Interests:

Non-Classified Claims. Claims and interests shall be treated as follows under this Plan. Certain types of claims are automatically entitled to specific treatment under the Code. They are not considered impaired, and holders of such claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Code. As such, the Plan Proponent has *not* placed the following claims in any class. One category of such claims are administrative expenses are costs or expenses of administering the Debtor's chapter 11 case, which are allowed under § 507(a)(2) of the Code. Fees owed to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) are another category of such administrative expenses. Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition. The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment. All fees required to be paid by 28 U.S.C. §1930(a)(6) (U.S. Trustee Fees) will accrue and be timely paid. To the extent there are such fees due and owing on the confirmation date, such fees will be paid in cash in full on the Effective Date. Other U.S. Trustee Fees incurred after the confirmation date will be paid timely until the case is closed. Holders of other forms of allowed administrative expense claims shall be paid in cash, in full, on the Effective Date, or as agreed between the Debtor and such holder of administrative expense claim.

**Treatment of MedCare Group's Claims and Interests.**

MedCare Group Class 1 Claim. Notwithstanding anything to the contrary contained within the plan or approved disclosure statement, the Allowed MedCare Group Class 1 Claims shall be paid pursuant to the provisions of 11 U.S.C. § 1129(a)(9)(C) and (D), in equal monthly installments commencing 30 days from the Effective Date and ending 60 months from the Petition Date. The claims shall bear interest at the statutory rate of 12% per annum as provided by applicable non-bankruptcy law until said taxes are paid in full. The 2021 and subsequent ad valorem owed to the Taxing Jurisdictions shall be paid in the ordinary course of business and the Taxing Jurisdictions shall not be required to file a request for allowance and payment of their claims. The Taxing Jurisdictions shall retain all liens until such taxes are paid in full. In the event that any part of the retained property is sold during the term of the plan, the unpaid taxes secured by said property shall be paid in full and upon the sale of the property. If any property which secures the ad valorem tax claims is repossessed and posted for sale by any lienholder, the Taxing Jurisdictions shall be free to pursue their state law remedies for collection of all amounts due under the Texas Property Tax Code. The claims of the Taxing Jurisdictions are superior to and shall be paid before the claims of Veritex.

MedCare Group Class 2 Claims. Allowed MedCare Group Class 2 Claims will be paid in cash, in full plus interest at a rate of 4.0% in equal monthly installments over a period of seventy-two (72) months after the Effective Date, with the first payment due within thirty (30) days after the Effective Date.

MedCare Group Class 3 Interests. MedCare Pediatric Group GP, LLC will retain its 1% partnership interest in MedCare Group and continue to serve as its general partner. Steve Wang and Paige Kinkade will retain their limited partnership interests in exchange for their capital contribution of payment of all administrative expenses for professional fees and conversion of their unsecured claims into limited partnership interests.

**Treatment of MedCare Nursing's Claims and Interests.**

MedCare Nursing Class 1 Claim. Notwithstanding anything to the contrary contained within the plan or approved disclosure statement, the Allowed MedCare Nursing Class 1 Claims shall be paid pursuant to the provisions of 11 U.S.C. § 1129(a)(9)(C) and (D), in equal monthly installments commencing 30 days from the Effective Date and ending 60 months from the Petition Date. The claims shall bear interest at the statutory rate of 12%per annum as provided by applicable non-bankruptcy law until said taxes are paid in full. The 2021 and subsequent ad valorem owed to the Taxing Jurisdictions shall be paid in the ordinary course of business and the Taxing Jurisdictions shall not be required to file a request for allowance and payment of their claims. The Taxing Jurisdictions shall retain all liens until such taxes are paid in full. In the event that any part of the retained property is sold during the term of the plan, the unpaid taxes secured by said property shall be paid in full and upon the sale of the property. If any property which secures the ad valorem tax claims is repossessed and posted for sale by any lienholder, the Taxing Jurisdictions shall be free to pursue their state law remedies for collection of all amounts due under the Texas Property Tax Code. The claims of the Taxing Jurisdictions are superior to and shall be paid before the claims of Veritex.

MedCare Nursing Class 2 Claims. Allowed MedCare Group Class 2 Claims will be paid in cash, in full plus interest at a rate of 2.0% in equal monthly installments over a period of seventy-two (72) months after the Effective Date, with the first payment due within thirty (30) days after the Effective Date.

MedCare Nursing Class 3 Interests. MedCare Pediatric NSG, LLC will retain its 1% partnership interest in MedCare Nursing and continue to serve as its general partner. MedCare Group will surrender its limited partnership interest in MedCare Nursing. Steve Wang and Paige Kinkade will retain their limited partnership interests and obtain additional limited partnership interests in exchange for their capital contribution of payment of all administrative expenses for professional fees and conversion of their unsecured claims into limited partnership interests.

**Treatment of MedCare Rehab's Claims and Interests.**

MedCare Rehab Class 1 Claim. Notwithstanding anything to the contrary contained within the plan or approved disclosure statement, the Allowed MedCare Rehab Class 1 Claims shall be paid pursuant to the provisions of 11 U.S.C. § 1129(a)(9)(C) and (D), in equal monthly installments commencing 30 days from the Effective Date and ending 60 months from the Petition Date. The claims shall bear interest at the statutory rate of 12% per annum as provided by applicable non-bankruptcy law until said taxes are paid in full. The 2021 and subsequent ad valorem owed to the Taxing Jurisdictions shall be paid in the ordinary course of business and the Taxing Jurisdictions shall not be required to file a request for allowance and payment of their claims. The Taxing

Jurisdictions shall retain all liens until such taxes are paid in full. In the event that any part of the retained property is sold during the term of the plan, the unpaid taxes secured by said property shall be paid in full and upon the sale of the property. If any property which secures the ad valorem tax claims is repossessed and posted for sale by any lienholder, the Taxing Jurisdictions shall be free to pursue their state law remedies for collection of all amounts due under the Texas Property Tax Code. The claims of the Taxing Jurisdictions are superior to and shall be paid before the claims of Veritex.

MedCare Rehab Class 2 Claims. Allowed MedCare Rehab Class 2 Claims will be paid in cash, in full plus interest at a rate of 2.0% in equal monthly installments over a period of seventy-two (72) months after the Effective Date, with the first payment due within thirty (30) days after the Effective Date.

MedCare Rehab Class 3 Interests. MedCare Pediatric Rehab Center GP, LLC will retain its 1% partnership interest in MedCare Rehab and continue to serve as its general partner. MedCare Group will surrender its limited partnership interest in MedCare Rehab. Steve Wang and Paige Kinkade will retain their limited partnership interests and obtain additional limited partnership interests in exchange for their capital contribution of payment of all administrative expenses for professional fees and conversion of their unsecured claims into limited partnership interests.

**Treatment of MedCare Therapy's Claims and Interests.**

MedCare Therapy Class 1 Claim. Notwithstanding anything to the contrary contained within the plan or approved disclosure statement, the Allowed MedCare Therapy Class 1 Claims shall be paid pursuant to the provisions of 11 U.S.C. § 1129(a)(9)(C) and (D), in equal monthly installments commencing 30 days from the Effective Date and ending 60 months from the Petition Date. The claims shall bear interest at the statutory rate of 12% per annum as provided by applicable non-bankruptcy law until said taxes are paid in full. The 2021 and subsequent ad valorem owed to the Taxing Jurisdictions shall be paid in the ordinary course of business and the Taxing Jurisdictions shall not be required to file a request for allowance and payment of their claims. The Taxing Jurisdictions shall retain all liens until such taxes are paid in full. In the event that any part of the retained property is sold during the term of the plan, the unpaid taxes secured by said property shall be paid in full and upon the sale of the property. If any property which secures the ad valorem tax claims is repossessed and posted for sale by any lienholder, the Taxing Jurisdictions shall be free to pursue their state law remedies for collection of all amounts due under the Texas Property Tax Code. The claims of the Taxing Jurisdictions are superior to and shall be paid before the claims of Veritex.

MedCare Therapy Class 2 Claims. Allowed MedCare Therapy Class 2 Claims will be paid in cash, in full plus interest at a rate of 2.0% in equal monthly installments over a period of seventy-two (72) months after the Effective Date, with the first payment due within thirty (30) days after the Effective Date.

MedCare Therapy Class 3 Interests. MedCare Pediatric TPY, LLC will retain its 1% partnership interest in MedCare Therapy and continue to serve as its general partner. MedCare

Group will surrender its limited partnership interest in MedCare Therapy. Steve Wang and Paige Kinkade will retain their limited partnership interests and obtain additional limited partnership interests in exchange for their capital contribution of payment of all administrative expenses for professional fees and conversion of their unsecured claims into limited partnership interests.

**Treatment of Kinwan's Claims and Interests.**

Kinwan Class 1 Claim. Veritex will retain its liens. The terms and conditions of the Kinwan Note, deed of trust and security agreement, and all other loan documents shall remain in place, except that the $300,000 payment described below shall be applied to principal of the loan and not to accrued by unpaid interest, and the monthly principal and interest payment will be recalculated after application of the principal paydown. Kinwan shall pay the sum of $300,000.00 to Veritex within thirty (30) days after the Effective Date. Kinwan shall make a monthly principal and interest payment in the recalculated amount for a period of sixty (60) months after the Effective Date, with the first such payment due on the first day of the month following the Effective Date and each subsequent payment due on the first of each month. The remaining principal and accrued but unpaid interest due under the Kinwan Note, whether prepetition or postpetition in nature, shall be paid on or before the first day of the 19th month after the Effective Date.

Kinwan Class 2 Claim. Notwithstanding anything to the contrary contained within the plan or approved disclosure statement, the Allowed Kinwan Class 2 Claims shall be paid pursuant to the provisions of 11 U.S.C. § 1129(a)(9)(C) and (D), in equal monthly installments commencing 30 days from the Effective Date and ending 60 months from the Petition Date. The claims shall bear interest at the statutory rate of 12% per annum as provided by applicable non-bankruptcy law until said taxes are paid in full. The 2021 and subsequent ad valorem owed to the Taxing Jurisdictions shall be paid in the ordinary course of business and the Taxing Jurisdictions shall not be required to file a request for allowance and payment of their claims. The Taxing Jurisdictions shall retain all liens until such taxes are paid in full. In the event that any part of the retained property is sold during the term of the plan, the unpaid taxes secured by said property shall be paid in full and upon the sale of the property. If any property which secures the ad valorem tax claims is repossessed and posted for sale by any lienholder, the Taxing Jurisdictions shall be free to pursue their state law remedies for collection of all amounts due under the Texas Property Tax Code. The claims of the Taxing Jurisdictions are superior to and shall be paid before the claims of Veritex.

Kinwan Class 3 Interests. Steve Wang and Paige Kinkade will retain their membership interests in exchange for their capital contribution of payment of all administrative expenses for professional fees.

**Treatment of KW Properties' Claims and Interests.**

KW Properties Class 1 Claim. Veritex will retain its liens. The terms and conditions of the KW Properties Note, deed of trust and security agreement, and all other loan documents shall remain in place, except that the $100,000 payment described below shall be applied to principal of the loan and not to accrued by unpaid interest, and the monthly principal and interest payment will be recalculated after application of the principal paydown. KW Properties shall pay the sum of $100,000.00 to Veritex within thirty (30) days after the Effective Date. KW Properties shall

make a monthly principal and interest payment in the recalculated amount for a period of sixty (60) months after the Effective Date, with the first such payment due on the first day of the month following the Effective Date and each subsequent payment due on the first of each month. The remaining principal and accrued but unpaid interest due under the KW Properties Note secured by the E. Sam Houston Pkwy. property, whether prepetition or postpetition in nature, shall be paid on or before the first day of the 19th month after the Effective Date.

KW Properties Class 2 Claim. Notwithstanding anything to the contrary contained within the plan or approved disclosure statement, the Allowed KW Properties Class 2 Claims shall be paid pursuant to the provisions of 11 U.S.C. § 1129(a)(9)(C) and (D), in equal monthly installments commencing 30 days from the Effective Date and ending 60 months from the Petition Date. The claims shall bear interest at the statutory rate of 12% per annum as provided by applicable non-bankruptcy law until said taxes are paid in full. The 2021 and subsequent ad valorem owed to the Taxing Jurisdictions shall be paid in the ordinary course of business and the Taxing Jurisdictions shall not be required to file a request for allowance and payment of their claims. The Taxing Jurisdictions shall retain all liens until such taxes are paid in full. In the event that any part of the retained property is sold during the term of the plan, the unpaid taxes secured by said property shall be paid in full and upon the sale of the property. If any property which secures the ad valorem tax claims is repossessed and posted for sale by any lienholder, the Taxing Jurisdictions shall be free to pursue their state law remedies for collection of all amounts due under the Texas Property Tax Code. The claims of the Taxing Jurisdictions are superior to and shall be paid before the claims of Veritex.

KW Properties Class 3 Interests. Steve Wang and Paige Kinkade will retain their membership interests in exchange for their capital contribution of payment of all administrative expenses for professional fees.

**Treatment of KW Enterprises' Claims and Interests.**

KW Enterprises Class 1 Claim. KW Enterprises shall, within sixty (60) days after the Effective Date, pay the balance due under the KW Enterprises Note or return the real property and improvements located at 5095 Preston Road, Pasadena, Texas 77505 to Veritex in full and final satisfaction of the amounts due under the KW Properties Note secured by the Pasadena property.

KW Enterprises Class 2 Claim. Notwithstanding anything to the contrary contained within the plan or approved disclosure statement, the Allowed KW Enterprises Class 2 Claims shall be paid pursuant to the provisions of 11 U.S.C. § 1129(a)(9)(C) and (D), in equal monthly installments commencing 30 days from the Effective Date and ending 60 months from the Petition Date. The claims shall bear interest at the statutory rate of 12% per annum as provided by applicable non-bankruptcy law until said taxes are paid in full. The 2021 and subsequent ad valorem owed to the Taxing Jurisdictions shall be paid in the ordinary course of business and the Taxing Jurisdictions shall not be required to file a request for allowance and payment of their claims. The Taxing Jurisdictions shall retain all liens until such taxes are paid in full. In the event that any part of the retained property is sold during the term of the plan, the unpaid taxes secured by said property shall be paid in full and upon the sale of the property. If any property which secures the ad valorem tax claims is repossessed and posted for sale by any lienholder, the Taxing Jurisdictions shall be

free to pursue their state law remedies for collection of all amounts due under the Texas Property Tax Code. The claims of the Taxing Jurisdictions are superior to and shall be paid before the claims of Veritex.

KW Enterprises Class 3 Interests. Steve Wang and Paige Kinkade will retain their membership interests in exchange for their capital contribution of payment of all administrative expenses for professional fees.

**Treatment of KW Commercial's Claims and Interests.**

KW Commercial Class 1 Claim. KW Commercial shall, on the Effective Date, pay Veritex $400,000.00 on the KW Commercial Note. In addition, KW Commercial shall make monthly principal and interest payments on the remaining balance under the KW Commercial Note, reamortized over a twenty (20) year term, for a period of six (6) months with the first such payment due on the first of the month following the Effective Date. The remaining unpaid principal and interest shall be due on the first date of the 7th month following the Effective Date. Within ten (10) days after payment in full of the amount due under the KW Commercial Note, Veritex shall execute and file in the real property records of Galveston County, Texas a release of its deed of trust.

KW Commercial Class 2 Claim. Notwithstanding anything to the contrary contained within the plan or approved disclosure statement, the Allowed KW Commercial Class 2 Claims shall be paid pursuant to the provisions of 11 U.S.C. § 1129(a)(9)(C) and (D), in equal monthly installments commencing 30 days from the Effective Date and ending 60 months from the Petition Date. The claims shall bear interest at the statutory rate of 12% per annum as provided by applicable non-bankruptcy law until said taxes are paid in full. The 2021 and subsequent ad valorem owed to the Taxing Jurisdictions shall be paid in the ordinary course of business and the Taxing Jurisdictions shall not be required to file a request for allowance and payment of their claims. The Taxing Jurisdictions shall retain all liens until such taxes are paid in full. In the event that any part of the retained property is sold during the term of the plan, the unpaid taxes secured by said property shall be paid in full and upon the sale of the property. If any property which secures the ad valorem tax claims is repossessed and posted for sale by any lienholder, the Taxing Jurisdictions shall be free to pursue their state law remedies for collection of all amounts due under the Texas Property Tax Code. The claims of the Taxing Jurisdictions are superior to and shall be paid before the claims of Veritex.

KW Commercial Class 3 Interests. Steve Wang and Paige Kinkade will retain their membership interests in exchange for their capital contribution of payment of all administrative expenses for professional fees.

THE TREATMENT OF EACH CLASS OF CLAIMS AS TO THE DEBTORS AND THE IS DESCRIBED MORE FULLY IN THE PLAN, ATTACHED AS EXHIBIT A. YOU SHOULD REFER TO THE PLAN FOR THIS FULL DESCRIPTION. IF THE PLAN IS CONFIRMED, THE TREATMENT PROVIDED IN THE PLAN IS THE TREATMENT THAT WILL BE IN EFFECT AND ENFORCEABLE.

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTORS AND THUS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

## III.

## PLAN VOTING INSTRUCTIONS AND PROCEDURES

### A. Notice to Holders of Claims and Interests.

Approval by the Bankruptcy Court of this Disclosure Statement means that the Bankruptcy Court has found that this Disclosure Statement contains information of a kind and in sufficient and adequate detail to enable Holders of Claims to make an informed judgment whether to accept or reject the Plan.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE PLAN ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.

No solicitation of votes may be made except after distribution of this Disclosure Statement and no person has been authorized to distribute any information concerning the Debtors other than the information contained herein. No such information will be relied upon in making a determination to vote to accept or reject the Plan.

### B. Voting Rights

Pursuant to the provisions of the Bankruptcy Code, only holders of claims in classes that are (a) treated as "impaired" by the plan and (b) entitled to receive a distribution under such plan are entitled to vote on the plan. In these Chapter 11 Cases, under the Plan, only Holders of Claims in Certain Classes are entitled to vote on the Plan (See pages 9 and 10 above). Claims and Interests in other Classes are either (i) Unimpaired and their Holders are deemed to have accepted the Plan,

or (ii) receiving no distributions under the Plan and their Holders are deemed to have rejected the Plan.

Only Holders of Allowed Claims in the voting Classes are entitled to vote on the Plan. A Claim that is unliquidated, contingent or disputed is not an Allowed Claim, and is thus not entitled to vote, unless and until the amount is estimated or determined, or the dispute is determined, resolved or adjudicated in the Bankruptcy Court or another court of competent jurisdiction, or pursuant to agreement with the Debtors. However, the Bankruptcy Court may deem a contingent, unliquidated or disputed Claim to be Allowed on a provisional basis, for purposes only of voting on the Plan.

Holders of Allowed Claims in the voting Classes may vote on the Plan only if they are Holders as of the Voting Record Date, which Voting Record Date is [_____], 2020.

**C. Solicitation Materials**

In soliciting votes for the Plan pursuant to this Disclosure Statement, the Debtors, through their counsel, will send to Holders of Claims who are entitled to vote copies of (a) the Disclosure Statement and Plan, (b) the notice of, among other things, (i) the date, time and place of the hearing to consider confirmation of the Plan and related matters and (ii) the deadline for filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"), (c) one or more ballots (and return envelopes) to be used in voting to accept or to reject the Plan and (d) other materials as authorized by the Bankruptcy Court.

If you are the Holder of a Claim that is entitled to vote, but you did not receive a ballot, or if your ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact the following:

**If by regular mail, overnight courier, or hand delivery:**

Matthew B Probus
Wauson | Probus
One Sugar Creek Center Blvd., Suite 880
Sugar Land, Texas 77478

**If by telephone:**

Matthew B. Probus
Wauson | Probus
(281) 242-0303

**D. Voting Procedures, Ballots and Voting Deadline**

After reviewing the Plan and this Disclosure Statement, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying ballot. You should complete and sign your original ballot (copies will not be accepted) and return

it in the envelope provided. Each ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded ballot or ballots sent to you with this Disclosure Statement.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND RECEIVED NO LATER THAN [_______,] 2020, AT [_]:00 P.M. CENTRAL TIME (THE "VOTING DEADLINE") BY THE FOLLOWING:

**If by regular mail, overnight courier or hand delivery:**

Matthew B. Probus
Wauson | Probus
One Sugar Creek Center Blvd., Suite 880
Sugar Land, Texas 77478

UNLESS OTHERWISE PROVIDED IN THE INSTRUCTIONS ACCOMPANYING THE BALLOTS, FAXED BALLOTS WILL NOT BE ACCEPTED. BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED. BALLOTS THAT ARE SIGNED BUT DO NOT SPECIFY WHETHER THE HOLDER ACCEPTS OR REJECTS THE PLAN WILL BE NULL AND VOID. DO NOT RETURN ANY DEBT INSTRUMENTS OR OTHER EVIDENCE OF YOUR CLAIM WITH YOUR BALLOT.

If you have any questions about (a) the procedure for voting your Claim, (b) the packet of materials that you have received, or (c) the amount of your Claim, or if you wish to obtain, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), an additional copy of the Plan, this Disclosure Statement or any appendices or exhibits to such documents, please contact:

**If by regular mail, overnight courier or hand delivery:**

Matthew B. Probus
Wauson | Probus
One Sugar Creek Center Blvd., Suite 880
Sugar Land, Texas 77478

**If by telephone:**

Matthew B. Probus
Wauson | Probus
(281) 242-0303

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least 2/3 in amount, and more than ½ in number, of the claims of that class that actually casts ballots for acceptance or rejection of the plan. Thus, class acceptance takes place

only if 2/3 in amount and a majority in number of the holders of claims voting cast their ballots in favor of acceptance.

The Bankruptcy Code defines acceptance of a plan by a class of Equity Interests as acceptance by holders of at least 2/3 in amount of the Equity Interests of that class that actually cast ballots for acceptance or rejection of the plan. Thus, class acceptance takes place only if 2/3 in amount of the holders of Equity Interests voting casts their ballots in favor of acceptance.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the plan. By order of the Bankruptcy Court, the Bankruptcy Court will consider confirmation of the Plan at the Hearing scheduled for _____________, 2020 at ________ o'clock a.m. (Houston Time) in Courtroom 403, United States Courthouse, 515 Rusk Street, 4th Floor, Houston, Texas. The confirmation may be adjourned from time to time by the Bankruptcy Court without further notice accept for an announcement made at the confirmation hearing or any adjournment thereof.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the plan. Any objection to confirmation of the plan must be made in writing and filed with the Bankruptcy Court and served via mail or hand delivery, upon the Debtor, the United States Trustee, and those parties requesting notice, together with proof of service, on or before __________________.

Objections to confirmation of the plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**1. <u>Requirements for Confirmation of the Plan</u>.**

At the confirmation hearing the Bankruptcy Court shall determine whether the Bankruptcy Code's requirements for confirmation of the plan have been satisfied, in which event the Bankruptcy Court shall enter an order confirming the plan. As set forth in Section 1129 of the Bankruptcy Code, these requirements are as follows:

1. The plan complies with the applicable provisions of the Bankruptcy Code.
2. The proponent of the plan complies with the applicable provisions of the Bankruptcy Code.
3. The plan has been proposed in good faith and not by any means forbidden by law.
4. Any payment made or to be made by the proponent, by the Debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in, or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Court as reasonable.
5. (a) (i) the proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a joint plan with the Debtor, or a successor to the Debtor under the plan; and

    (ii) the appoint to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and
  (b) The proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized Debtor, in the nature of any compensation for such insider.

6. Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the Debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.
7. With respect to each class of impaired claims or Equity Interests;
   (a) Each holder of a claim or interest of such class:
      (i) has accepted the plan; or
      (ii) will receive or retain under the plan on account of such claim or interest property of the value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on such date; or
   (b) If section 1111 (b) (2) of the Bankruptcy Code applies to the claims of such class, the holder of the claim of such class will receive or retain under the plan on account of such claim property of a value, as of the Effective Date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.
8. With respect to each class of claims or interests:
   (a) Such class has accepted the plan; or
   (b) Such class is not impaired under the plan;
9. Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:
   (a) With respect to a claim of the kind specified in section 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;
   (c) With respect to a class of claims of the kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each holder of the claim of such class will receive:
      (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
      (ii) if such class has not accepted the plan, cash on the Effective Date of the plan equal to the allowed amount of such claim; and
   (d) With respect to a claim of the kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of a claim will receive on account of such claim regular installment payments in cash of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such claim, over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303, and in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)).

10. If a class of claims is impaired under the plan, at least one class of claims that is impaired has accepted the plan, determined without including any acceptance of the plan by any insider.
11. Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the plan, unless such liquidation or reorganization is proposed to the plan.
12. All fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.
13. The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.
14. All transfers of property of the plan shall be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

The Debtors believe that the plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code, that it has complied or will have complied with all of the requirements of Chapter 11, and that the proposal of the plan is made in good faith.

The Debtors believe that the holders of all claims impaired under the plan will receive payments or distributions under the plan having a present value as of the Effective Date in amounts not less than the amounts likely to be received by such holders if the Debtors were liquidated in a case under chapter 7 of the Bankruptcy Code. At the confirmation hearing, the Bankruptcy Court will determine whether holders of claims would receive greater distributions under the plan than they would receive in liquidation under chapter 7. A discussion of the Debtor's liquidation analysis is provided below in Article VIII, Section B.

The Debtors also believe that confirmation of the plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtors under the plan. Attached as Exhibit D hereto is a projected cash flow statement showing the cash flow that is projected for the Reorganized Debtors for the years 2018 - 2020.

**2. <u>Cramdown</u>.**

In the event that any impaired class of claims or Equity Interests does not accept the plan, the Bankruptcy Court may still confirm the plan at the request of the Debtor if, as to each impaired class which has not accepted the plan, the plan "does not discriminate unfairly" and is "fair and equitable." The plan of reorganization does not discriminate unfairly which in the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims.

"Fair and equitable" has different meanings with respect to the treatment of secured and unsecured claims. As set forth in section 1129(b)(2) of the Bankruptcy Code, those meanings are as follows:

(1) With respect to a class of secured claims:
  (a) (i) The plan provides that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the Debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
    (ii) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the Effective Date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
  (b) for the sale, subject to section 363 (k) of the Bankruptcy Code, of any property that is subject to the lien securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (a) and (b) of this subparagraph; or
  (c) for the realization by such holders of the indubitable equivalent of such claims.

(2) With respect to a class of unsecured claims:
  (a) the plan provides that each holder of a claim of such class receive or retain on the account of such claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such claim; or
  (b) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.
(3) with respect to a class of interests:
  (a) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the Effective Date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price which such holder is entitled, or the value of such interest; or
  (b) the holder of any interest that is junior to the interest of such class will not receive or retain under the plan on account of such junior interests any property.

In the event that one or more classes of impaired claims rejects the plan, the Bankruptcy Court will determine at the confirmation hearing whether the plan is fair and equitable with respect to and does not discriminate unfairly against any rejecting impaired class of claims.

THE DEBTORS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO EXERCISE THEIR RIGHT BY VOTING IN FAVOR OF THE PLAN AND OTHERWISE COMPLETING THEIR BALLOTS AND RETURNING THEM BY THE VOTING DEADLINE.

### E. Confirmation Hearing and Deadline for Objections to Confirmation

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled a Confirmation Hearing for __________, 2020, at _____ a.m. (prevailing Central time). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. Objections to confirmation of the Plan or proposed modifications to the Plan, if any, must (i) be in writing, (ii) conform to the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court, (iii) state the name and address of the objecting party and the amount and nature of the claim or interest of such party, (iv) state with particularity the basis and nature of any objection to the Plan and (v) be filed electronically, together with proof of service, with the United States Bankruptcy Court for the Southern District of Texas, 515 Rusk, Houston, Texas 77002, www.txs.uscourts.gov, and served on the parties listed in the Confirmation Hearing notice, in each case so as to be actually received on or before 4:00 p.m. **(**prevailing Central time) on **[_____________ __,** 2020**]**. Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014.

## IV.

## GENERAL INFORMATION CONCERNING THE DEBTORS

### A. Overview of Business Operations

The Debtors together provide a variety of pediatric services to families. MedCare Pediatric Nursing, LP provides in home nursing care to medically fragile children with complex medical needs who cannot care for themselves and require 24-hour care. MedCare Pediatric Therapy, LP provides in home therapy such as physical therapy, speech therapy, and occupational therapy, to children with complex special needs such as Down Syndrome. MedCare Pediatric Rehab Center, LP provides out-patient one-on-one behavioral health and out-patient physical therapy/occupational therapy/speech therapy services to autistic children and other children with developmental delays who are on the spectrum in various stages. MedCare Pediatric Group, LP is the parent entity that provides administrative and executive services such as IT, HR, and finance for each of the MedCare entities. Kinwan, LLC owns the real property and improvements at which the corporate offices are maintained and at which some services are provided. Kinkade-Wang Properties, LLC and Kinkade-Wang Enterprises, LLC own real property and improvements that serve as clinic locations for the out-patient services provided by the MedCare group of companies.[2] The MedCare companies have leases with these real estate entities to operate. The rental income of the leases pays the principal and interest payments to the secured lender, Veritex Community Bank.

The Debtors operations of their multiple health care business lines requires substantial staffing. Most of the staffing consists of nurses and non-medical staff for the therapy care.

[2] KW Commercial Holdings, LLC owns a Galveston home, which serves as additional collateral for the loans held by Veritex Bank, NA and allows the Debtors to have use of their funds.

However, the Debtors are also required to have a facility physician. In order to run these business, the Debtors also have corporate staffing. Finally, given that the Debtors operate healthcare facilities, cleaning and maintenance is critical, and the Debtors employ two full-time cleaning and maintenance employees. The facility physician, Dr. Kin Loc, is a contract employee. The cleaning persons are contract as well. These contract persons are paid directly by MedCare Pediatric Rehab Center, LP. The staff, including corporate staff, are employees of non-debtor, but related, entities and are leased by the MedCare Debtors. The MedCare Debtors transfer funds to the non-debtor employers who then issue the payroll checks to the employees. Rise Corporate, LLC provides all corporate staffing for MedCare Pediatric Group, LP. Rise Home Health, LLC provides all staffing for MedCare Pediatric Therapy, LP. Rise Pediatric Therapy Center, LLC provides all PTOC speech staffing for MedCare Pediatric Rehab Center, LP, and Rise ABA Therapy, LLC provides all behavioral health staff for the autism program for MedCare Pediatric Rehab Center, LP. Rise Staffing, LLC provides the staffing for MedCare Pediatric Nursing, LP.

In addition, Rise Corporate, LLC maintains 401(k) retirement plan for all employees of all Rise entities on behalf of MedCare entities at One America (the "401(k) Plan"). All eligible employees have the option of participating in the 401(k) Plan. The Debtors do not contribute or match contributions of employees to the plan. The employees make contributions through withholdings from their paychecks.

The Debtors that are healthcare service providers, MedCare Pediatric Nursin, LP, MedCare Pediatric Rehab Center, LP, and MedCare Pediatric Therapy, LP, are licensed by the Texas Health and Human Services Commission. Those licenses are current and in good standing. The Texas Health and Human Services Commission, and under its auspices the Texas Medical Board, supervise the operations of the MedCare Group.

The MedCare Companies have an excellent history of patient care dating back to its inception. It has never had its licenses suspended or revoked for any reason. It has never had a finding of a violation of the regulations. It has always provided top-flight service to all of its patients.

The MedCare Companies' actual patients are children with complex special needs such as Down Syndrome and autism. For this reason, the MedCare Companies deal directly with the patients' parents and guardians, who have a complete ability to protect the patients' rights. Further, with respect to the patients receiving in-home nursing care, the patients' parents and guardians maintain the charts of the children through a platform established by the MedCare Companies. The MedCare Companies maintain a mix of electronic and paper medical records for patients, and the paper medical records are adequately protected. Further, patients have access to their medical records and, generally, a low level of dependency on the MedCare Companies.

The patients have a low dependency, if any, on the MedCare Companies' facilities. Although the MedCare Companies maintain clinics at which it provides out-patient services, those services are not such that require the patients to be at the facility. The services provided at the facilities are occupational therapy, speech therapy, physical therapy, and ABA therapy. The other forms of services provided by the MedCare Companies are in-home services for either nursing or for occupational therapy, speech therapy, and physical therapy. Since these are performed in the

patients' own home, the patients using those services have no dependency on the MedCare facilities at all. There are no pending lawsuits or claims being made by any patients against the MedCare Companies.

The MedCare Companies maintain multiple safeguards to ensure appropriate levels of care. The services are provided based on a plan approved by the facility physician employed by MedCare Companies. Each clinic operated by the MedCare Companies have a facility director overseeing all services. The services are provided in teams. There is a regulatory compliance director, and that person's name and contact information is provided to all patients (parents/guardians of patients). In addition, all patients receive an "intake packet," that informs the patients of the privacy rights and protections in place to protect privacy. The intake packet also provides the patients with the contact information for the U.S. Department of Health and Human Services Office for Civil Rights in case they want or feel the need to file a complaint against the Debtor. The intake packet also provides information on the policy and procedure for patients/guardians to file and prosecute complaints against the Debtors internally in the companies.

### B. Events Leading to Commencement of Chapter 11 Cases

The ultimate cause of the bankruptcy was the reduction in allowed payment levels for the Debtors' services set by the State, which impacted not only Medicaid payments by the State, but payments allowed by the private payors who contracted with the State. This caused significant cash shortfalls in 2019, which in turn caused the Debtors to fail to pay its 941 employee withholding taxes for the 2nd and 3rd quarters of 2019. The Internal Revenue Service issued a levy, which is now under an administrative appeal, and threatened to file a federal tax lien against the Debtors' property on March 2, 2020. In order to avoid the filing of the federal tax lien, which would have a devastating effect on the Debtors' loans with Veritex and its ongoing efforts to refinance those loans, the Debtors filed their voluntary chapter 11 petition.

### C. Pre-Confirmation Capital Structure of the Debtors

The MedCare Companies are all ultimately owned by the parent corporation, MedCare Pediatric Group, LP. MedCare Pediatric Group, LP owns 97% of MedCare Pediatric Nursing, LP, Medcare Pediatric Rehab Center, LP, and Medcare Pediatric Therapy, LP. Lauren Kinkade and Steve Wang each own 1% of each of these companies, and the remaining 1% is owned by GP, LLC's of the same name (eg: MedCare Pediatric Rehab GP, LLC). MedCare Pediatric Group, LP itself is owned 49.5% by Lauren Kinkade and 49.5% by Steven Wang, with the remaining 1% owned by MedCare Pediatric Group GP, LLC. Kinwan, LLC, Kinkade-Wang Properties, LLC, Kinkade-Wang Enterprises, LLC, and KW Commercial Holdings, LLC are all owned 50% by Lauren Kinkade and 50% by Steve Wang.

**D. Pre-Petition Officers, Board Members and Employees**

The pre-petition officers and directors of the Debtors are as follows:

MedCare Pediatric Group, LP:

Lauren Page Kinkade, CEO, Limited Partnership interest
Steve Wang, CFO, Limited Partnership interest

MedCare Pediatric Nursing, LP:

Lauren Paige Kinkade, CEO, Limited Partnership interest
Steve Wang, CFO, Limited Partnership interest

MedCare Pediatric Rehab Center, LP:

Lauren Paige Kinkade, CEO, Limited Partnership interest
Steve Wang, CFO, Limited Partnership interest

MedCare Pediatric Therapy, LP:

Lauren Paige Kinkade, CEO, Limited Partnership interest
Steve Wang, CFO, Limited Partnership interest

Kinwan, LLC:
Paige Kinkade, President, Member, Manager
Steve Wang, Member and Manager

Kinkade-Wang Properties, LLC:

Paige Kinkade, President, Member, Manager
Steve Wang, Member and Manager

Kinkade-Wang Enterprises, LLC:

Paige Kinkade, President, Member, Manager
Steve Wang, Member and Manager

KW Commercial Holdings, LLC:

Paige Kinkade, President, Member, Manager
Steve Wang, Member and Manager

**E. <u>Summary of Assets and Financial Position</u>**

The Debtors have filed schedules that contain a breakdown of the assets owned by each debtor. Generally, the parent company MedCare Pediatric Group, LP owns the subsidiary MedCare entities, MedCare Pediatric Nursing, LP, MedCare Pediatric Therapy, LP, and MedCare Pediatric Rehab Center, LP. MedCare Pediatric Group, LP also owns certain assets separate. Generally those consist of furniture, fixtures, and office equipment, a Lincoln Navigator vehicle, and other machinery such as a vending machine and a lawn mower. Each of the subsidiaries generally own the following: furniture, fixtures, and office equipment, various other machinery and equipment, health service licenses, patient lists, and goodwill of business.

The remaining Debtors are real estate asset companies owning certain real property and improvements. Those include the real property and improvements located at: (i) 5095 Preston Ave, Pasadena, Texas 77505 owned by KW Properties; (ii) 4818 East Sam Houston Parkway North, Houston, Texas 77015 owned by KW Properties; (iii) 21004 North Freeway, Spring, Texas 77373 owned by KW Enterprises; (iv)12371 S. Kirkwood Rd, Houston, Texas 77477 owned by Kinwan; and (v) 4 Blue Heron Circle, Jamaica Beach, Texas 77554 owned by KW Commercial.

The schedules provide asset values on a net book basis, and in some cases liquidation or replacement cost basis, which are not reflective of actual values. The schedules may be reviewed on the Bankruptcy Court electronic case filing system or during business hours in the offices of the Clerk of the Bankruptcy Court. Information regarding the Debtors' assets is also available in the Liquidation Analysis attached hereto as Exhibit B.

The Debtors' financial information for the time period during the case can be seen in the monthly operating reports for the month of March 2020 and filed at Doc. Nos. 98 – 105. The Debtors' projected financial information for the next 5 years are attached as Exhibit C.

**V.**

**<u>DEBTOR'S CHAPTER 11 CASE</u>**

On March 1, 2020, the Debtors filed the Chapter 11 bankruptcy petitions in the Southern District of Texas, Houston Division. The Bankruptcy Court ordered a joint administration of the cases under the lead case filed, MedCare Pediatric Group, LP, case number 20-31417. The Debtors have continued operating as debtors-in-possession since the filing date.

On February 28, 2020, the Debtors retained Wauson | Probus to represent them in their Chapter 11 cases. On March 1, 2020, they filed their application to employ Wauson | Probus. The same day, Wauson | Probus filed its disclosure of compensation pursuant to Fed. R. Bankr. P. 2016(b). On March 25, 2020, the Court entered an order granting the application to employ Wauson | Probus.

The Debtors filed certain "first day motions." On March 1, 2020, the Debtors filed an emergency motion to continue to operate their cash management system and maintain existing

bank accounts and continue to perform intercompany transactions and an Emergency Motion for Joint Administration for all of the cases under the case of MedCare Pediatric Group, LP. The Court set these motions for emergency hearing to be held on March 3, 2020. After hearing the motions, the Court entered orders granting the motions.

On March 2, 2020, the Debtors filed an Emergency Motion for Interim and Continuing Use of Cash Collateral. The Court set an emergency hearing to be held on March 5, 2020. After hearing the motion, on March 6, 2020, the Court entered an order granting the use of cash collateral on an interim basis for 23 days and set a hearing for March 23, 2020, to consider additional and continuing use of cash. The Debtors reach an agreement with the secured creditor Veritex for use of cash and submitted a proposed agreed order. On March 20, 2020, the Court signed an order granting Debtors continued interim use of cash collateral for 90 days and setting another hearing for June 29, 2020, to consider additional use of cash collateral.

On March 2, 2020, the Court entered an order setting a hearing to consider whether to appoint a patient ombudsman in this case. The Debtors filed an Objection to Appointment of Ombudsman. A hearing was scheduled for March 10, 2020 on this matter. The result of this hearing was an Order Requiring Appointment of an Ombudsman. The judge's reasoning was that the patients of this facility, including disabled minor children, had a limited ability to protect their own rights. Thomas A. Mackey was appointed as the Patient Care Ombudsman, and his First Interim Report is due to be filed on or around April 14, 2020.

On March 16, 2020, the Debtors timely filed their schedules and statements of financial affairs.

On March 17, 2020, the Debtors filed an Emergency Motion for Approval of Adequate Assurance Procedures to Prevent Disruption of Utilities because the interruption of utility service could completely disrupt business operations. The Court initially set the motion for an emergency hearing, but on March 20, 2020, the motion was denied for insufficient service.

On March 30, 2020, the Debtors filed an Emergency Motion for Approval of Premium Finance Agreement with IPFS Corporation to finance the payment of insurance premiums. On March 31, 2020, the Court entered an order approving the post-petition financing.

On April 27, 2020, the Debtors filed their application to employ CMCD LLC as their accountants. CMCD LLC has served as the Debtors' accountants for years prior to the bankruptcy filing, handling the Debtors' bookkeeping, financial statements, tax returns of all kinds, and other necessary accounting functions. The Debtors negotiated a new engagement with CMCD LLC for services to be performed in the bankruptcy case, including preparing monthly operations reports required by the U.S. Trustee. That new engagement agreement is dated March 27, 2020.

## VI.

## PLAN IMPLEMENTATION AND OTHER PROVISIONS OF THE PLAN

### A. Plan Implementation Action Generally.

The Debtors each have a separate and distinct function but have always been intertwined and interrelated. Generally, there are two groups of debtors: the MedCare Companies which operate various forms of pediatric care for children with complex disabilities and the real estate companies that own and hold the real property and improvements that the MedCare companies use to see their pediatric patients. The monthly debt service on the properties owned by the real estate debtors is substantial and beyond what a market rental rate would be for comparable space. As the MedCare Companies began experiencing financial trouble in 2018 and 2019 due to cuts to reimbursement rates, it became more and more difficult for the MedCare Companies' revenue to support these mortgage payments. The members of MedCare Group, Paige Kinkade and Steve Wang, borrowed against personal assets to contribute and loan funds to make the mortgage payments. This too became unsustainable. Thus, for the MedCare Companies to be profitable, one of the steps that must be taken is for them to stop paying rent in the amount of the mortgages to the real estate companies on all the properties. Thus, KW Enterprises will return the Pasadena property to Veritex in satisfaction of the KW Enterprises Note and KW Properties will return the I-45 North property to Veritex in satisfaction of the KW Properties Note that is secured by that property in satisfaction of that note. MedCare Rehab was the company that was were seeing patients at those facilities. It will direct some patient flow to the E. Sam Houston Pkwy. Property and the remaining patient flow to the Stafford office owned by Kinwan.

In addition, Kinwan will lease the unimproved property next to the Stafford building to a commercial developer on a long-term lease or locate a buyer for the property in order to generate additional funding for the plan and to increase profitability. Kinwan will have sufficient funds to meet its monthly P&I payment for its note to Veritex from the rental income it will receive from the MedCare Companies.

The MedCare Companies' revenue will sustain its operating expenses and fund the plan payments. The plan payments to the IRS on its priority unsecured tax debt will be paid within 5 years from the petition date through a combination of monthly payments and contribution of funds by Paige Kinkade and Steve Wang obtained by them from sale of a piece of real estate they own. The allowed general nonpriority unsecured creditors will be paid in full with interest under the plan.

### B. Retention and Prosecution of Causes of Action.

Pursuant to 11 U.S.C. § 1123(b)(3)(B), as of the Effective Date any Causes of Action that are already pending or that are property of the estate of the Debtors, even if not yet filed, including, without limitation all common law tort, statutory tort, statutory claims and contract claims and claims for equitable relief of all kinds and avoidance or recovery actions under 11 U.S.C. § 544, 545, 547, 548, 549, 550, 551 and 553, shall become property of the restructuring debtors. Such restructuring debtors shall have the authority to prosecute such Causes of Action for the benefit of

their estates and their creditors to be distributed pursuant to this Plan. Such restructuring debtors shall have the authority to compromise and settle, otherwise resolve, discontinue, abandon or dismiss all such Causes of Action without approval of the Bankruptcy Court. All cash received by the restructuring debtors as a result of prosecution or settlement of any Causes of Action or of enforcement of any judgment or order obtained in connection with any Cause of Action shall be distributed in accordance with the terms of the Plan. Unless a Cause of Action is released as an express term of this Plan, no Cause of Action is released by confirmation of this Plan, and confirmation of the Plan shall not have any *res judicata* or collateral estoppel effect on the restructuring debtors' prosecution of any Cause of Action.

**C. <u>Pre-Petition Claim and Administrative Claim Bar Date; Objection Deadline</u>.**

Creditors must have filed their proofs of claims with respect to pre-petition claims on or before the Bar Date of July 1, 2020 (or September 2, 2020 for a governmental unit), after which date any proof of claim filed will have no effect on the Plan and no right to participate with other creditors under the Plan.

Except as excepted below, all persons and entities (including without limitation, individuals, partnerships, corporations, joint ventures, trusts, and governmental units), that assert any claim against the Debtor pursuant to Section 503(b) of Bankruptcy Code that first arose or accrued after March 1, 2020 (an "Administrative Expense"), shall file an application for approval of the Administrative Expense in writing on or before September 2, 2020 at 5:00 o'clock p.m. (the "Administrative Expense Bar Date"). The holders of the following types of claims (the "Excluded Administrative Expenses") are not required to file applications for Administrative Expense on or before the Administrative Expense Bar Date:

(a) Administrative Expenses of professional persons, as that term is used in sections 327, 328, 330, 331, 503(b)(2) and/or 1103 of the Bankruptcy Code, retained pursuant to a final order of the Court;
(b) Administrative Expenses, if any, previously allowed by order(s) of the Court;
(c) Administrative Expenses, if any, on account of which a motion requesting allowance and payment already has been filed in the Court against the Debtor; and
(d) Administrative Expenses held by the United States Trustee for the Southern District of Texas which arise under section 1930(a)(6) of title 28 of the United States Code.
(e) Claims of governmental units pursuant to 11 U.S.C. 503(b)(1)(D).
(f) Claims of the State of Texas Comptroller for post-petition taxes due.

Any holder of a claim for Administrative Expense against the Debtors that is required, but fails to file an application for Administrative Expense on or before the Administrative Expense Bar Date shall: (i) be forever barred, estopped, and enjoined from asserting any Administrative Expense against the Debtor, the Debtor's estate, and they shall be deemed forever discharged from any and all indebtedness or liability with respect to such Administrative Expense and (ii) not be entitled to receive further notices regarding such Administrative Expenses. Nothing in this Order shall, or shall be deemed to, prejudice the Debtors' or any other party's right to object to any Administrative Expense on any ground, or to dispute, or to assert offsets against or defenses to, any Administrative

Expense as to amount, liability, classification, priority or otherwise, and to subsequently designate any claim or lien as disputed, contingent, or unliquidated.

Except as otherwise set forth in the Plan or as otherwise extended or ordered by the Bankruptcy Court, all objections to pre-petition claims and/or post-petition administrative expense claims must be filed no later than one hundred twenty days (120) days after the Effective Date (unless such day is not a Business Day; in which case, such deadline will be the next Business Day thereafter unless extended by an order of the Bankruptcy Court). An objection to a Claim will be deemed properly served on the holder thereof if service is effected by any of the following methods: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (b) to the extent counsel for a Claimant is unknown, by first-class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto; or (c) by first-class mail, postage prepaid, on any counsel that has appeared on the behalf of the Claimant in the Bankruptcy Case.

**D. <u>Provisions Governing Distribution.</u>**

(a) <u>Requirement for Allowance of Claims and Equity Interests</u>. No payment or other distribution will be made on account of any claim or Equity Interest that is not "allowed". The plan defines an "Allowed Claim" as: (i) a Claim which has been allowed by Final Order of the Court; (ii) a Claim timely filed with the Clerk of the Court or scheduled as other than unliquidated, disputed or contingent by the Debtor in its Schedules and Statement of Financial Affairs or Amended Schedules and Amended Statement of Affairs filed with the Court, as to which Claim no objection to the allowance thereof has been timely filed, or as to which Claim either an objection to the Claim or an application to amend the Schedules with respect to such Claim has resulted in the allowance of the Claim, in whole or in part, by Final Order of the Court; (iii) a Claim whose amount is established as a provision of the Plan; or (iv) a right to payment from the Estate Property for compensation or reimbursement as approved by the Court by Final Order. The Plan defines "Final Order" as an order or judgment, which is no longer subject to appeal or review. Any order or judgment which is pending a timely filed motion to correct or amend the order or judgment pursuant to F.R.B.P. 7052 or 9023 or which is pending a timely filed notice of appeal pursuant to F.R.B.P. 8002 shall not be considered a Final Order until after all such motions and appeals are exhausted. The bar date deadline for filing proofs of claim is not yet set, but when it is set it will serve as the Bar Date.

(b) <u>Date and Delivery of Distribution</u>. Distributions of cash under the plan will be made by the Newly Reorganized Debtor beginning on the dated that is on the fifth (5th) day of the month following thirty days after the Effective Date. (the "Distribution Date").

(c) <u>Means of Cash Payment and Time Bar</u>. Cash payments to be made by the Reorganized Debtor pursuant to the Plan will be made in U.S. funds by check drawn on a domestic bank. Checks issued in respect of Allowed Claims will be null and void if not cashed within 90 days of the date of issuance thereof. Any claim in respect of such a voided check must be made on or before the later of

the first anniversary of the distribution date or 90 days after the date of issuance of such check. After such date, all claims in respect of void checks will be discharged and forever barred.

**E. Provisions for Resolving Contested Claims.**

(a) Filing Pre-Petition Claims. Creditors must have filed their proofs of claims with respect to pre-petition claims on or before the Bar Date, after which date any proof of claim filed will have no effect on the Plan and no right to participate with other creditors under the Plan.

(b) Objections to Claims and Objection Deadline. Any party in interest, including, without limitation, the Debtors, may make and file objections to the Claims. No party is obligated to administer, dispute, reserve for, object to, compromise, resolve or make Distributions with respect to any and all Allowed Claims. No party is obligated to object to any Claim but will nevertheless have standing to object to any such Claim from and after the Effective Date, if they so elect in their absolute discretion. Nothing in this section is intended to limit the right of any party in interest to object to Claims. Except as otherwise set forth in the Plan or as otherwise extended or ordered by the Bankruptcy Court, all objections to pre-petition claims and/or post-petition administrative expense claims must be filed no later than one hundred twenty days (120) days after the Effective Date (unless such day is not a Business Day; in which case, such deadline will be the next Business Day thereafter unless extended by an order of the Bankruptcy Court). An objection to a Claim will be deemed properly served on the holder thereof if service is effected by any of the following methods: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (b) to the extent counsel for a Claimant is unknown, by first-class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto; or (c) by first-class mail, postage prepaid, on any counsel that has appeared on the behalf of the Claimant in the Bankruptcy Case.

(c) Post-Confirmation Amendments to Proofs of Claims. Except as otherwise provided in the Plan, following the Confirmation Date, a Claim may not be amended unless such amendment results in a decrease of the amount of the Claim, change in priority of the Claim to a lower priority under the Bankruptcy Code, or withdrawal of Claim. Any unauthorized amendment shall be deemed null, void, and of no force or effect.

(d) Claims Estimation. The Reorganized Debtor may request estimation or limitation of any contingent, unliquidated, or Disputed Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether that Claim was previously objected to or whether the Bankruptcy Court has ruled on any such objection; provided, however, that the Bankruptcy Court will determine (a) whether such Disputed Claims are subject to estimation pursuant to Section 502(c) of the Bankruptcy Code and (b) the timing and procedures for such estimation proceedings, if any. The Bankruptcy Court will retain jurisdiction to

estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Plan or the Bankruptcy Court.

(e) No Distributions on Disputed Claims Pending Allowance. No Distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order and the Disputed Claim has become an Allowed Claim. The Reorganized Debtor may, in his sole discretion, withhold Distributions otherwise due hereunder to the holder of a Claim until the Objection Deadline to enable the Reorganized Debtor to file a timely objection thereto. When a Disputed Claim becomes an Allowed Claim, the Reorganized Debtor shall make Distributions with respect to such Allowed Claim, without interest (except as otherwise provided in this Plan), net of any setoff and/or any required withholding of applicable taxes.

(f) Distribution Reserve Account. On or after the Effective Date, the Reorganized Debtor will establish a Distribution Reserve Account as is appropriate, in its sole and absolute discretion, for the benefit of holders of Disputed Claims pending the allowance thereof, the amount of which will be adjusted from time to time as appropriate. A Claimant will not be entitled to receive or recover any amount in excess of the amount provided in the Distribution Reserve Account specifically reserved to pay such Claim unless permitted by Order of the Bankruptcy Court. Nothing in the Plan will be deemed to entitle the holder of a Disputed Claim to post-petition interest on such Claim, if Allowed, unless otherwise required under the Bankruptcy Code or the Plan.

(g) Distributions After Allowance. Payments and Distributions from the Distribution Reserve Account to each respective holder of a Disputed Claim, to the extent it becomes an Allowed Claim, will be made in accordance with the provisions of the Plan that govern Distributions to such holders of Claims in the Class in which such Claimant is classified. Unless otherwise provided in the Plan, as promptly as practicable after the date on which a Disputed Claim becomes undisputed, non-contingent, liquidated and Allowed, and in no event later than thirty (30) days after the Disputed Claim becomes an Allowed Claim, the Reorganized Debtor will distribute to the Claimant the property from the Distribution Reserve Account that would have been distributed to such Claimant had its Claim been an Allowed Claim on the date that Distributions were previously made to holders of Allowed Claims in the Class in which such

Claimant is classified under the Plan. After all Disputed Claims have been resolved and all such Claims that become Allowed Claims have been paid in full, any remaining property in the Distribution Reserve Account will be distributed the Reorganized Debtor.

(h) Allowance of Claims Subject to Bankruptcy Code Section 502(d). Allowance of Claims will, in all respects, be subject to the provisions of Section 502(d) of the Bankruptcy Code, except as provided by a Final Order of the Bankruptcy Court or a settlement among the relevant parties.

## F. Miscellaneous Provisions.

(a) Recognition of Guarantee and Subordination Rights. The classification and manner of satisfying all claims under this plan takes into consideration (a) the existence of guarantees by the Debtor of obligations of other persons, (b) the fact that the Debtor may be a joint obligor with another person or persons with respect to the same obligation, and (c) any contention by holders of claims against the Debtor that the Claims of other holders are subordinated by contract or otherwise to their Claims. All Claims against the Debtor are based upon the express requirement and terms of this Plan that any such guarantees, subordination claims or joint obligations shall be discharged in the manner provided in this Plan, and which holders of such Claims shall be entitled to only one distribution with respect to any obligation of the Debtor. All Claims against the Debtor, and all rights and claims between or among holders of Claims relating in any manner whatsoever to Claims against the Debtor, based upon any claimed subordination rights or rights to avoid payments or transfers of property pursuant to any provision of the Bankruptcy Code or other applicable law, shall be deemed satisfied by the distributions under this Plan to holders of claims hereunder and shall not be subject to levy, garnishment, attachment, or like legal process by any holder of a Claim by reason of any claim subordination rights or otherwise, except as otherwise provided herein, so that each holder of a Claim shall have and receive the benefits of the distributions in the manner set forth in this plan.

(b) Injunction and Stay of Proceedings. Unless otherwise specified in this Plan, all Entities who have held, hold, or may hold Claims against the Debtors are permanently enjoined on and after the Effective Date from: (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim against the Debtors; (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against the Debtors with respect to any such Claim; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors or against property of the Debtors with respect to any such Claim; (d) from asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Debtors or against property of the Debtors with respect to any such Claim; (e) conducting any form of discovery from the Debtors with respect to any such Claim; and/or (f) harassing the Debtors. Unless otherwise provided in this Plan, all injunctions or stays set forth in Sections 105 and 362

of the Bankruptcy Code (11 U.S.C. §§ 105 and 362) shall remain in full force and effect until the Effective Date of the Plan rather than the Confirmation Date. However, this shall not be construed as a limitation of the permanent injunctions provided for in the Plan. **The post-confirmation injunction described above shall also apply to Veritex's suit on the guaranty agreements against Paige Kinkade and Steve Wang so long the Debtors perform their obligations to Veritex under the Plan. If the Debtors fail to timely perform such obligations to Veritex under the Plan, the post-confirmation injunction shall cease to apply against Veritex as to the guarantors Paige Kinkade and Steve Wang.**

(c) With respect to any Unexpired Lease, nothing in the Plan or [the Confirmation Order] shall modify the Debtors' or Reorganized Debtors' obligation to pay: (1) amounts owed under an assumed Unexpired Lease of non-residential real property that are unbilled or not yet due as of the Confirmation Date, whether accruing prior to or after the effective date of assumption of such Unexpired Leases, such as for common area maintenance, insurance, taxes, and similar charges; and any regular or periodic ordinary course year-end adjustments and reconciliations of such charges provided for under the terms of the Unexpired Leases, whether accruing prior to or after the effective date of assumption of such unexpired leases, as such charges become due in the ordinary course in accordance with the terms of the Unexpired Leases; (2) any percentage rent that may come due under the assumed Unexpired Lease of non-residential real property; (3) any other obligations, including indemnification obligations (if any) that arise from third-party claims asserted with respect to or arising from the Debtors' use and occupancy of the premises prior to the Effective Date for which the Debtors had a duty to indemnify such Landlord pursuant to any Unexpired Lease, or the Debtors' or Reorganized Debtors' obligation to pay any postpetition expenses under such Unexpired Leases as they come due under the Unexpired Leases; and (4) any unpaid cure amounts or post-assumption obligations under the assumed Unexpired Lease of non-residential real property. Notwithstanding any of the releases, discharges, injunctions or waivers set forth in the Plan, nothing in the Plan or the Confirmation Order shall modify the rights, if any, of any counterparty to an Unexpired Lease of non-residential real property to assert any right of setoff or recoupment that such counterparties may have under applicable bankruptcy or non-bankruptcy law, including, but not limited to, the ability, if any, of such counterparties to setoff or recoup a security deposit held pursuant to the terms of their Unexpired Leases with the Debtors or the Reorganized Debtors.

(d) Property of the Estate/Payments. All of the assets of the Restructuring Debtors shall be transferred to the Reorganized Debtors on the Effective Date and shall cease to constitute property of the estate. The payments required under the Plan are the only payments to be made to the Holders of Allowed Claims, and no others, in satisfaction of such Allowed Claims.

(e) U.S. Trustee Requirements. Until the Effective Date, the Debtors shall be responsible for timely payment of fees incurred pursuant to 28 U.S.C. § 1930(a)(6) as provided for in the Plan. After the Effective Date, the

Reorganized Debtors shall file with the Court and serve upon the United States Trustee on behalf of the Debtors a quarterly financial report for each quarter or portion thereof that the case remains open in a format prescribed by the United States Trustee and provided to the Debtors by the United States Trustee.

## G. Consummation of the Plan.

(a) Retention of Jurisdiction. The plan provides that the Court shall retain exclusive jurisdiction over the Debtors' chapter 11 cases to determine, among other things, all disputes relating to claims, adversary proceedings, all issues presented by, arising or stated in the plan, and all matters pending on the Effective Date.

(b) Modification of the Plan. The Debtors may amend or modify the plan before or after confirmation in accordance with the provisions of Section 1127 of the Bankruptcy Code.

(c) Revocation of the Plan. The Debtors may revoke and withdraw the plan at any time prior to confirmation.

## H. Federal Income Tax Consequences of the Plan on the Debtors and the Creditors.

### 1. Introduction.

The following discussion summarizes certain significant U.S. federal income tax consequences of the transactions that are described herein and in the Plan that affect holders of Claims or Interests and the Debtors. This summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), the Treasury Department regulations promulgated thereunder (the "Treasury Regulations"), judicial authority and current administrative rulings and practice now in effect. These authorities are all subject to change at any time by legislative, judicial or administrative action, and such change may be applied retroactively in a manner that could adversely affect holders of Claims or Interests and the Debtor. The federal income tax consequences to any particular holder of a Claim or Interests may be affected by matters not discussed below. For example, the impact of the Plan under any foreign, state or local law is not discussed. Further, this summary generally does not address the tax consequences to Claim holders who may have acquired their Claims from the initial holders nor does it address the tax considerations applicable to Claim holders or Interest holders that may be subject to special tax rules such as financial institutions, insurance companies, dealers in securities or currencies, tax-exempt organizations or taxpayers subject to the alternative minimum tax. To the extent that the summary of payments to Claimholders in this section conflicts with other parts of this Disclosure Statement or the Plan, the discussion in such other parts of the Disclosure Statement or the Plan shall govern.

NO RULING WILL BE SOUGHT FROM THE INTERNAL REVENUE SERVICE (the "IRS"), AND NO OPINION OF COUNSEL HAS BEEN OR WILL BE SOUGHT, WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN. THE DISCUSSION SET FORTH BELOW IS FOR GENERAL INFORMATION ONLY. THIS DESCRIPTION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE

DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS. EACH CLAIM AND INTEREST HOLDER IS URGED TO CONSULT WITH ITS OWN TAX ADVISER REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

**2. Federal Income Tax Consequences to Debtors.**

Generally, a taxpayer recognizes cancellation of indebtedness ("COD") income upon satisfaction of its outstanding indebtedness for less than its adjusted issue price. The amount of COD income is, in general, the excess of (i) the adjusted issue price of the indebtedness satisfied, over (ii) the issue price of any new indebtedness issued by the taxpayer, the amount of cash and the fair market value of any other consideration (including stock of the taxpayer) given in exchange for the indebtedness satisfied. However, COD income is not included in gross income to a debtor if the discharge occurs in a Title 11 case or the discharge occurs when the debtor is insolvent. Rather the debtor generally must, after determining its tax for the taxable year of discharge, reduce its net operating losses ("NOL(s)") and any capital loss carryovers first and then, as of the first day of the next taxable year, reduce the tax basis of its assets by the amount of COD income excluded from gross income by this exception. The Debtors do not expect there to be any tax effect to the Debtors as a result of the Plan.

**3. Consequences to Holders of Claims.**

The federal income tax consequences of the implementation of the Plan to a holder of a Claim will depend, among other things, upon the origin of the holder's Claim, when the holder's Claim becomes an Allowed Claim, when the holder receives payment in respect of such Claim, whether the holder reports income using the accrual or cash method of accounting, whether the holder has taken a bad debt deduction or worthless security deduction with respect to such Claim and whether the holder's Claim constitutes a "security" for federal income tax purposes. Generally, a holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for stock and other property (such as Cash and new debt instruments), in an amount equal to the difference between (i) the sum of the amount of any Cash, the issue price of any debt instrument, and the fair market value on the date of the exchange of any other property received by the holder (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income). The treatment of accrued but unpaid interest and amounts allocable thereto varies depending on the nature of the holder's claim and is discussed below.

Whether or not such realized gain or loss will be recognized (i.e., taken into account) for federal income tax purposes will depend in part upon whether such exchange qualifies as a recapitalization or other "reorganization" as defined in the Tax Code, which may in turn depend upon whether the Claim exchanged is classified as a "security" for federal income tax purposes. The term "security" is not defined in the Tax Code or in the Treasury Regulations. One of the most significant factors considered in determining whether a particular debt instrument is a security is the original term thereof. In general, the longer the term of an instrument, the greater the likelihood that it will be considered a security. As a general rule, a debt instrument having an original term of 10 years or more will be classified as a security, and a debt instrument having an original term

of fewer than five years will not. Debt instruments having a term of at least five years but less than 10 years are likely to be treated as securities, but may not be, depending upon their resemblance to ordinary promissory notes, whether they are publicly traded, whether the instruments are secured, the financial condition of the debtor at the time the debt instruments are issued and other factors. Each holder of an Allowed Claim should consult his or her own tax advisor to determine whether his or her Allowed Claim constitutes a security for federal income tax purposes.

The Debtors intend to take the position that all payments in respect of Allowed Claims will be first allocated to the principal amount of the Allowed Claim, with any excess allocated to accrued unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes. In general, to the extent any amount received by a holder of an Allowed Claim is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally will recognize a deductible loss to the extent any accrued interest claimed was previously included in gross income and is not paid in full. Each holder of an Allowed Claim is urged to consult its tax advisor regarding the allocation of consideration and deductibility of unpaid interest for tax purposes. A holder, who, under his accounting method, was not previously required to include in income, accrued but unpaid interest attributable to its existing Claims, and who exchanges its interest Claim for cash, or other property, pursuant to the Plan will be treated as receiving ordinary interest income to the extent of any consideration so received allocable to such interest, regardless of whether that holder realizes an overall gain or loss as a result of the exchange of its existing Claims.

Allowed Claims will be paid from the operating income of the Reorganized Debtors. A claimholder's tax basis in a Claim should generally equal the amount included in income as a result of the provision of goods or services to the debtor, except to the extent that a bad debt loss had previously been claimed. The gain or loss should be capital gain or loss under Section 1221 of the Tax Code to the extent that the Claim did not arise in the ordinary course of trade or business for services rendered or from the sale of inventory to the Debtors, in which case such gain or loss should generally be ordinary. Any capital gain or loss recognized by a holder of a Claim should be long-term capital gain or loss with respect to Claims held for more than one year.

**4. Withholding and Reporting.**

The Debtors will withhold all amounts required by law to be withheld and will comply with all applicable reporting requirements of the Tax Code. Under the Tax Code, interest, dividends and other "reportable payments" may under certain circumstances be subject to "backup withholding" at a rate equal to the fourth lowest rate of tax under Section 1(c) of the Tax Code. Backup withholding generally applies if the Holder (i) fails to furnish his social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails to report interest or dividends or (iv) under certain circumstances fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct number and the Holder is not subject to backup withholding. Your ballot contains a place to indicate your TIN.

AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE

PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OR HER OWN TAX ADVISER REGARDING THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT ENTITY.

## I. Assumption and Rejection of Unexpired Leases and Executory Contracts.

On Schedule G of their schedules, the Debtors each list certain unexpired leases of nonresidential real property and/or executory contracts with parties. Those leases and contract, listed by Debtor and whether they are being assumed or rejected are as follows:

Assumed Executory Contracts and Unexpired Leases.

| Debtor | Other Party | Type of Agreement |
|---|---|---|
| MedCare Group | Bank of America Leasing | Unexpired lease of NetSuite software, 31 months remaining |
| MedCare Group | CIT | Unexpired lease of 4 copy machines |
| MedCare Group | Holders Pest Control | Executory contract for pest control services |
| MedCare Group | Iron Mountain | Executory contract, month to month, for storage |
| MedCare Group | Microsoft | Unexpired lease of OneDrive, Email, and cloud services |
| MedCare Group | Omni Fire and Security | Executory contract, month to month, for security services |
| MedCare Group | ProShred | Executory contract, month to month, for secure shredding services |
| MedCare Group | Raintree Systems | Unexpired software license |
| MedCare Group | Rise Corporate, LLC | Executory contract for staffing services |
| MedCare Group | TIAA | Unexpired lease of Nutanix servers with 5-year support and licenses |
| MedCare Group | Hudson Energy | Executory contract for energy services |
| MedCare Nursing | CFG Merchant Solutions | Executory contract for purchase of accounts receivable, 9 months remaining |
| MedCare Nursing | Kantime, Inc. | Unexpired lease of electronic medical records and data storage, 12 months remaining |
| MedCare Nursing | Raintree Systems | Executory contract for electronic medical records software hosting, month to month |
| MedCare Nursing | Rise Staffing, LLC | Executory contract for staffing services |
| MedCare Nursing | Zirmed | Unexpired license for claims gateway software, 9 months remaining |
| MedCare Nursing | Kinwan, LLC | Unexpired lease of building space at 12371 S. Kirkwood Rd., Stafford, TX, 32 months remaining |
| MedCare Rehab | Portia ABA Clinic Software | Executory contract for data collection services, month to month |
| MedCare Rehab | Rise ABA Therapy, LLC | Executory contract for staffing services, 10 months remaining |
| MedCare Rehab | Rise Pediatric Therapy Center, LLC | Executory contract for staffing services, 10 months remaining |
| MedCare Rehab | Waste Management | Executory contract for trash services at 5095 Preston Rd, Pasadena, TX, month to month |
| MedCare Rehab | Republic Services | Executory contract for trash services at 4818 E. Sam Houston Pkwy, Houston, TX |
| MedCare Rehab | Zirmed | Executory contract for claims management and batch services, 4 months remaining |
| MedCare Rehab | Kinkade-Wang Properties, LLC | Unexpired lease of building space at 4818 E. Sam Houston Pkwy, Houston, TX, 32 months remaining |

| | | |
|---|---|---|
| MedCare Rehab | Kinwan, LLC | Unexpired lease of building space at 12371 S. Kirkwood Rd., Stafford, TX, 32 months remaining |
| MedCare Therapy | Rise Home Health, LLC | Executory contract for staffing services, 10 months remaining |
| MedCare Therapy | Kinwan, LLC | Unexpired lease of building space at 12371 S. Kirkwood Rd., Stafford, TX, 32 months remaining |
| Kinwan | MedCare Nursing, MedCare Rehab, and MedCare Therapy | Unexpired lease of building space at 12371 S. Kirkwood Rd., Stafford, TX, 32 months remaining |
| KW Properties | MedCare Rehab | Unexpired leases of building space at 4818 E. Sam Houston Pkwy, Houston, TX, and 21004 N. I-45, Houston, TX, 32 months remaining |

Rejected Executory Contracts and Unexpired Leases.

| **Debtor** | **Other Party** | **Type of Agreement** |
|---|---|---|
| MedCare Group | Wells Fargo Vendor Finance | Unexpired lease of copy machines, 32 months remaining |
| MedCare Rehab | Kinkade-Wang Enterprises, LLC | Unexpired lease of building space at 5095 Preston Road, Pasadena, TX, 32 months remaining |
| MedCare Rehab | Kinkade-Wang Properties, LLC | Unexpired lease of building space at 21004 N. I-45, Houston, TX, 32 months remaining |
| KW Enterprises | MedCare Rehab | Unexpired lease of building space at 5095 Preston Road, Pasadena, TX, 32 months remaining |

Those parties whose leases and/or contracts are rejected by the Debtors may submit a proof of claim for damages from the rejection as an unsecured claim.

### J. Purchase of Shares of Reorganized Debtors.

The owners Paige Kinkade and Steve Wang are receiving interests in the newly reorganized debtors in exchange for their capital contributions for payment of the Debtors' professional fees and conversion of their unsecured loans to the Debtors into equity. In addition, they are contributing substantial funds to the Debtors to fund plan payment of the IRS.

## VII.

## CERTAIN RISK FACTORS TO BE CONSIDERED

The Holders of Claims in Classes that are eligible to vote should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A. General Considerations

The Plan sets forth the means for satisfying the Claims against each of the Debtors. See pages 11 to  of this Disclosure Statement entitled "Classification and Treatment of Claims and

Interests" for a description of the treatments of each class of Claims and Interests. Certain Claims and Interests receive no distributions pursuant to the Plan.

### B. Certain Bankruptcy Considerations

Even if all voting Impaired Classes vote in favor of the Plan, and if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" are met, the Bankruptcy Court may choose not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, and that the value of distributions to dissenting Holders of Claims and Interests will not be less than the value such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion. See Exhibit B for a liquidation analysis of the Debtors.

### C. Claims Estimations

There can be no assurance that any estimated Claim amounts set forth in this Disclosure Statement are correct. The actual Allowed amount of Claims likely will differ in some respect from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should any underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from those estimated herein.

### D. Conditions Precedent to Consummation

The Plan provides for certain conditions that must be satisfied (or waived) prior to confirmation of the Plan and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

## VIII.

## FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

The alternative to the Plan is a Chapter 7 liquidation. In the event of such as liquidation, the Debtors believe that the assets of the Debtors would not be sufficient to pay any distribution at all to any of the tax creditors or the unsecured creditors. In fact, in the event of such a liquidation, the Debtors believe that the only creditors that would receive anything would be Veritex and the Internal Revenue Service. Under the Debtors' Plan, the MedCare Companies' debt load will be substantially reduced, because it will be rejecting its leases with its affiliated debtor entities and either seeing their patients at the Stafford location or at another leased location that will be rented at a market rate. KW Properties and KW Enterprises will be returning their properties to Veritex in satisfaction of the promissory notes that those properties secured. The Debtors are also

continuing to decrease their operating expenses, including but not limited to payroll. The Debtors have negotiated with the owners of the equity interests in the Debtors to have them convert their debt, which is approximately $1 million, into equity, which frees up cash flow to pay other unsecured creditors and improves the Debtors' balance sheet substantially.

Finally, the Debtors will be supplementing their revenue by leasing the unimproved real property of Kinwan, LLC to a third party and leasing space in the Stafford building to a third party. Kinwan will be contributing this revenue to the MedCare Companies for Plan payments. The IRS and the general, nonpriority creditors of the Debtors will receive payment of 100% of the Allowed Amount of their Claims under the Plan.

## A. <u>Feasibility of the Plan</u>

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.

The projected financial statements of the Debtors show that the Debtors will have sufficient cash to fund their operations and to make the payments contemplated by the Plan. Accordingly, the Debtors believe that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code. Accordingly, the Debtors believe that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code as to the reorganizing Debtors.

As noted above even if a plan is accepted by each class of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 cases and the chapter 11 cases. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid administrative expenses incurred by

the debtors in their chapter 11 cases that are allowed in the chapter 7 cases, litigation costs and claims arising from the operations of the debtor during the pendency of the chapter 11 case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity security interests. The liquidation would also prompt the rejection of a large number of executory contracts and unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection damages claims.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

## B. Liquidation Analysis

For purposes of the best interest's test, in order to determine the amount of liquidation value available to Creditors, the Debtors prepared a liquidation analysis, annexed hereto as Exhibit B, which concludes that in the event of a forced liquidation of the Debtors' assets under chapter 7, the aggregate value to be realized by the Debtors' estates for distribution to nonpriority unsecured creditors would be $0.00. In a chapter 7 liquidation, almost all of the value would be distributed to Holders of Allowed Secured Claims (Veritex and taxing authorities) and the IRS, and no other Holder of a general, nonpriority unsecured Claim would receive a distribution.

The Debtors believe that any liquidation analysis with respect to the Debtors is inherently speculative. The Liquidation Analysis for the Debtors necessarily contains estimates of the net proceeds that would be received from a forced sale of assets and/or business units, as well as the amount of Claims that would ultimately become Allowed Claims. Claims estimates are based solely upon the Debtors' books and records. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtors have projected an amount of Allowed Claims that represents their best estimate of the chapter 7 liquidation dividend to Holders of Allowed Claims. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

## C. Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation

It is impossible to determine with certainty the value each Holder of a Claim will receive under the Plan as a percentage of any Allowed Claim. Notwithstanding the difficulty in quantifying recoveries with precision, the Debtors believe that the financial disclosures contained herein imply a greater recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation. Accordingly, the Debtors believe that the "best interest's" test of section 1129 of

the Bankruptcy Code is satisfied.

**D. <u>Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative</u>**

In the event any Class of Impaired Claims rejects the Plan, the Debtors may seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of a debtor if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank. The Debtors believe the Plan does not discriminate unfairly with respect to the impaired classes of Claims and Interests.

A plan is "fair and equitable" as to holders of unsecured claims that reject the plan if the plan provides either that: (a) each holder of a claim of such class receives or retains on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest or (b) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

The Debtors believe that they could, if necessary, meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to Holders of Impaired Claims and Interests.

*[Remainder of Page Intentionally Left Blank]*

## VIII.

## CONCLUSION

All holders of claims against the Debtors are urged to vote to accept the plan and to evidence such acceptance by returning their ballots so that they will be received by the deadline for voting which is _______________.

DATED: May 15, 2020

By: ______________________________
**Paige Kinkade on behalf of:**

MEDCARE PEDIATRIC GROUP, LP
MEDCARE PEDIATRIC NURSING, LP
MEDCARE PEDIATRIC REHAB CENTER, LP
MEDCARE PEDIATRIC THERAPY, LP
KINWAN, LLC
KINKADE-WANG PROPERTIES, LLC
KINKADE-WANG ENTERPRISES, LLC
KW COMMERCIAL HOLDINGS, LLC

**WAUSON | PROBUS**

By: ______________________________
**Matthew B. Probus**
State Bar No. 16341200
Fed. I.D. No. 10915
Comerica Bank Building
One Sugar Creek Center Blvd., Suite 880
Sugar Land, Texas 77478
Tele. No. (281) 242-0303
Fax No. (281) 242-0306
mbprobus@w-plaw.com
ATTORNEYS FOR DEBTORS,
MEDCARE PEDIATRIC GROUP, LP
MEDCARE PEDIATRIC NURSING, LP
MEDCARE PEDIATRIC REHAB CENTER, LP
MEDCARE PEDIATRIC THERAPY, LP
KINWAN, LLC
KINKADE-WANG PROPERTIES, LLC
KINKADE-WANG ENTERPRISES, LLC
KW COMMERCIAL HOLDINGS, LLC